[No. D045941. Fourth Dist., Div. One. Oct. 20, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
GUILLERMO RAMIREZ, Defendant and Appellant.

**COUNSEL**

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Raquel M. Gonzalez and Angela M. Borzachillo, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

Defendant Guillermo Ramirez appeals from a final judgment following a jury trial in which he was convicted of raping an intoxicated person (Pen.

Code,[1] § 261, subd. (a)(3)). The trial court sentenced Ramirez to the midterm of six years in state prison and imposed a $1,200 restitution fine, which was suspended pending the successful completion of parole, and $813.96 in victim restitution.

Ramirez challenges both his conviction and sentence, contending that the trial court (1) erred in allowing the prosecutor to introduce evidence of statements the victim made to other individuals hours after the rape, under the spontaneous statement exception to the hearsay rule; (2) erred in refusing to instruct the jury with CALJIC 4.35, the general mistake of fact instruction; and (3) abused its discretion by sentencing Ramirez to state prison rather than probation.

We conclude that the trial court erred in allowing in evidence statements the victim made to third parties about the rape for purposes other than as allowed pursuant to the fresh-complaint doctrine. However, the error did not prejudice Ramirez. We further conclude that the trial court was correct in declining to instruct the jury with CALJIC No. 4.35 as to mistake of fact. Finally, we conclude that the trial court did not abuse its discretion in sentencing Ramirez to state prison rather than probation. We thus affirm the trial court's judgment and sentence.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *Procedural background*

Ramirez was charged with rape by means of force or fear (§ 261, subd. (a)(2)) (count 1), rape of an intoxicated person (§ 261, subd. (a)(3)) (count 2), and unlawful sexual intercourse with a minor more than three years younger than defendant (§ 261.5, subd. (c)) (count 3). A jury found Ramirez guilty on count 2 and not guilty on count 3. The jury deadlocked on the charge of forcible rape. Pursuant to a motion by the prosecution, the court dismissed count 1.

On February 2, 2005, the trial court sentenced Ramirez to the midterm of six years in state prison. The court imposed a $1,200 restitution fine under section 1202.4, subdivision (b), which the court suspended pending successful completion of parole. The court also ordered Ramirez to pay $813.96 in victim restitution under section 1202.4, subdivision (f).

---

[1] All statutory references are to the Penal Code, unless otherwise specified.

Ramirez filed a timely notice of appeal from the court's judgment and sentence on February 14, 2005.

## B. *Factual background*

In January 2004, 16-year-old Ana H. was living with her 24-year-old brother in Vista. Their parents lived in Mexico. On January 17, Ana and her friend Adrienne attended a birthday party for a 15-year-old girl. Ana's brother drove her to the party, but he had not made plans to pick her up. Ana and Adrienne left the party at approximately 11:00 p.m. because some "cholos" (gang members or "tough guys") were bothering them, and they started to walk to Ana's brother's house.

The cholos followed Ana and Adrienne outside and continued to bother them. Ana and Adrienne came upon a house where they could hear a party taking place. In an attempt to escape further harassment from the cholos, they decided to enter the house. Ana had never been to the home before and did not know anyone at the party. Adrienne knew the disc jockey. After she said hello to him, the girls watched people dancing.

Adrienne met a young man named Omar and started dancing with him. Omar asked Ana how old she was, and she told him she was 16. Omar then introduced Ana to his cousin "Gill."[2] Adrienne and Omar continued to dance, and Ramirez left. Approximately 20 to 30 minutes later, Adrienne and Omar told Ana that Omar was going to give the girls a ride to Ana's brother's house. Around 12:20 a.m., Ana and Adrienne got into Omar's car along with Ramirez and Omar. Adrienne sat in the front seat with Omar, and Ana sat in the backseat with Ramirez.

Adrienne said she was hungry, so the group went to a restaurant in San Marcos. They were at the restaurant for about 30 minutes. Ana listened while Adrienne, Omar, and Ramirez talked. She heard Omar tell Ramirez that Ana was 16 years old.

As the group left the restaurant, Adrienne said she wanted to drink some alcohol. Omar responded that he had some alcohol at his home. The group drove to Omar's apartment. Omar went inside to get the alcohol while the other three remained in the car. Omar brought back a bottle of tequila. The group stopped at a convenience store to buy cups. All four individuals began drinking the tequila in the parking lot of the convenience store. Ana had consumed alcohol on two other occasions, but had never been intoxicated.

---

[2] At trial, Ana identified Ramirez as "Gill."

Omar did not want to drive because he had been drinking. Ramirez declined to drive because he had "already had problems with the police." Omar suggested that they rent a room at a nearby hotel. The group drove to a Ramada Inn that was less than five minutes away, and Omar rented a room.[3]

The group went into the hotel room and continued drinking. Ramirez asked Ana to come over to where he was sitting, but she declined. After the group finished the bottle of tequila, Omar told Ramirez to go get another bottle. Adrienne told Ana to go with Ramirez so she could be alone with Omar. Ana and Ramirez left the hotel room at approximately 2:00 a.m., after Ana had consumed what amounted to a full glass of tequila.

Ana and Ramirez left in Omar's car and drove to Ramirez's apartment, where he retrieved a bottle of alcohol. Upon their return to the hotel, Ramirez told Ana that they should stay in the car so that Adrienne and Omar could be alone. While they were both in the front seat of the car, Ramirez tried to kiss Ana. She told him that she did not want him to kiss her. He continued to try to kiss her, and she pushed him away. Ramirez became angry when Ana refused his advances. He hit the windshield with his fist, cracking it. This frightened Ana.

Ramirez continued trying to kiss Ana, but she pushed him away. At some point, Ana felt dizzy and closed her eyes. When she opened them, she was in the backseat of Omar's car and Ramirez was moving on top of her with his penis in her vagina. Her bra and blouse had been pulled up, and her pants and underwear were at her ankles. She was dizzy and felt pain in her vagina. Ana reached down to touch her vaginal area. After she did so, she saw blood on her hand and started to cry. Ana tried to push Ramirez away, but he pushed her shoulders down toward the seat and kissed her neck and her breasts as he continued to penetrate her. Ana had not had sexual intercourse before.

Ramirez finally stopped and pulled up his pants. Ana sat up, pulled up her pants and fixed her blouse. She noticed that she was still bleeding and that there was blood on the backseat of the car.

Ana returned to the hotel room, crying. Adrienne asked her what had happened. Ana said that she did not know and went into the bathroom. Ana showered for approximately 10 minutes because she "felt dirty." She was still bleeding when she finished showering. There was blood both in the tub and on a towel she had used. Ana got dressed and exited the bathroom, still crying. She told Adrienne that she wanted to go home. Adrienne told her to calm down. Adrienne said that Omar was going to talk to Ana's brother and

---

[3] The record is ambiguous as to who drove to the hotel.

tell him that Ana and Adrienne were going to stay at a friend's house. Omar grabbed Ana by the shoulders and threw her on the bed. Ramirez stood in the doorway of the room so that Ana could not leave. Ana cried and begged Ramirez to take her home. Ana believed these events occurred between 4:30 a.m. and 5:00 a.m.

Ana eventually got into the car with Ramirez, who was supposed to take her home. As he was driving, Ramirez pulled to the side of the road and tried to kiss Ana again. When she refused to let him kiss her, he told her to get out of the car. Ana walked for a few minutes, but was in a great deal of pain. She sat down and cried. Ramirez returned to where she was sitting and told her to get back in the car. He said that he was "not going to do anything anymore."

Ana got back into the car and fell asleep. The next thing she remembered was waking up in a strange apartment. She was lying in a bed, confused, and did not know how she had gotten there. A little boy and two girls were in front of her telling her to wake up.

Jessica Guzman's nephew woke her up at approximately 7:00 a.m. to tell her that there was a girl in his mother's room. Guzman found Ana lying in Guzman's cousin's room. Guzman had never seen Ana before. When she told Ana to leave, Ana told Guzman to leave her alone and to let her sleep. At some point, Ana got up and tried to place a telephone call to a friend, but was unable to reach the person. Ana indicated to Guzman that she thought she was in a friend's apartment. Ana commented that the bathroom was "very different" and that the bed was in a different place. Ana was walking very slowly, and was holding her groin area.

Guzman's aunt, Antonieta Mujica, arrived at the apartment after she learned that a strange girl was there. Mujica did not recognize Ana, who was lying on the bed crying and holding her stomach. Ana told Mujica that she had been raped. Mujica offered to help, and suggested calling Ana's brother. Ana did not want to call her brother, saying, "My brother is going to kill me." Mujica said that she was going to call the police. Ana ran out of the apartment. As she left, she said, "I'm sorry. I didn't steal anything from you."

Ana began walking, trying to find her way back to the hotel. She was in pain and crying. She walked "very slowly," stopping to rest after every 10 to 15 steps. She arrived at the Ramada Inn approximately two hours after she left Guzman's apartment, sometime between 8:30 and 9:00 a.m. Adrienne was not at the hotel. Omar had left the key with the clerk about 8:00 a.m. Ana asked the clerk if she could use the bathroom. While she was in the bathroom, Ana discovered that she was hemorrhaging. The clerk noticed that Ana was crying and that she looked frightened. She was walking very slowly.

The clerk called a number of Ana's friends, trying to reach one who could come to pick her up. When he asked Ana if she was okay, Ana responded, "I'm not okay because I've been raped." She told the clerk that "Guillermo" had raped her. Ana did not want the clerk to call an ambulance for her.

The clerk finally reached one of Ana's friends, who arrived at the hotel around noon. The friend took Ana to a park to eat. They stayed at the park until approximately 5:00 p.m. Ana did not want to return home because she had heard through a friend that her brother was angry that she had not come home the night before. Ana went to the home of Sylvia, a woman with whom Ana had previously lived. After Ana arrived at Sylvia's home, one of Ana's friends called the police.

The police came to Sylvia's residence and Ana told them what had happened. Police transported Ana to the sexual assault response team (SART) office at Palomar Hospital for an examination. Detective Tom Janenko noticed that Ana was walking very slowly and that she appeared to be experiencing considerable pain in her groin area. Amanda Jaeger-Jacobs performed a SART examination of Ana at 1:45 a.m. on January 19. Jaeger-Jacobs noted swelling, bruising and "quite a bit" of dried blood on the perineum. Ana had a large hematoma that covered the entire side of the labia, and a laceration just beyond the labium. Jaeger-Jacobs noted that the hematoma was a "very significant injury"—one she had seen in her work delivering babies, but not on a sexual assault victim. The amount of bleeding Ana suffered from an injury to her hymen was excessive compared to typical blood loss from first-time sexual intercourse. Jaeger-Jacobs concluded that Ana's injuries were consistent with the history Ana provided.

Jaeger-Jacobs sent Ana to the emergency room for further evaluation. Dr. Keri London examined Ana. Dr. London was unable to perform a full examination because the hematoma was blocking the entrance to the vagina. Dr. London noted that the creation of such a hematoma would require a large amount of force with "just the right" contact with something on one side of the vaginal wall. The injury could have been caused by a penis.

Ana testified that she was unable to walk normally for 10 to 15 days. She stayed at Sylvia's home for about a month, and then returned to her brother's home.

## III.

## DISCUSSION

### A. *The trial court erred in allowing the People to introduce statements Ana made to third parties, pursuant to the spontaneous declaration exception to the hearsay rule*

The prosecution filed a motion in limine seeking to offer in evidence statements Ana made to Mujica and Alejandro Galvan, the hotel clerk, under the "fresh complaint" rule, and statements Ana made to Guzman, Mujica, and Galvan as spontaneous declarations pursuant to Evidence Code section 1240. Specifically, the prosecution sought to introduce the statements Ana made to Guzman after she awoke in Guzman's apartment, to the effect, "It hurts, it hurts" while holding her crotch, and "I only live with my brother and if I go home now he is probably going to kill me."

The prosecution also sought to introduce statements Ana made to Mujica after Mujica asked her what had happened. Ana apparently told Mujica that she had attended a party in Vista the night before and that she and a friend had met two men at the party. She told Mujica that one of the men had raped her and then dropped her off when the car got a flat tire. When Mujica offered to call police, Ana declined, telling Mujica that she was afraid of her brother and what he would do if he found out what had happened to her. Finally, the prosecution sought to admit statements Ana made to Galvan when she returned to the hotel after having awakened in Guzman's apartment. Ana told Galvan that she had been raped the night before and that she was bleeding. She refused Galvan's offer to call an ambulance, telling him that she was too frightened of what her brother would do.

During a hearing regarding the admissibility of these statements, the prosecution argued that Ana's statements were admissible pursuant to the fresh complaint doctrine, and also under the spontaneous statement exception to the hearsay rule. Defense counsel contended that the statements were not fresh complaints because they were made three hours or more after the incident, and that the statements should not be admitted as spontaneous statements because Ana had time to fabricate a story before she made any of the statements at issue. The trial court ruled that the statements were admissible under both theories, concluding that the fact that Ana had been unconscious or asleep for a portion of time between the rape and the time she made the statements rendered the delay insufficient to prevent the statements from falling within an exception to the hearsay rule. The court noted that the fact that Ana had been asleep, and the confused state she was in when she awoke, were inconsistent with any detached reflection or deliberation.

■ Ramirez does not challenge the court's ruling that evidence that Ana disclosed or reported the rape to another person shortly after its occurrence was admissible under the fresh complaint doctrine. However, as Ramirez points out, the fresh complaint doctrine allows evidence to be admitted for the limited purpose of showing that a complaint was made by the victim, and not for the truth of the matter stated. (*People v. Brown* (1994) 8 Cal.4th 746, 761 [35 Cal.Rptr.2d 407, 883 P.2d 949].) Evidence admitted pursuant to this doctrine may be considered by the trier of fact for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime. (*People v. Bernstein* (1959) 171 Cal.App.2d 279, 285 [340 P.2d 299].) Here, however, in addition to admitting the statements under the fresh complaint doctrine, the trial court also allowed the statements in evidence under the spontaneous statement exception, for the truth of the matter asserted, i.e., that Ana had been raped. This was error.

■ Evidence Code section 1240 codified the common law exception for spontaneous statements. "The foundation for this exception [in the common law] is that if the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury." (*Showalter v. Western Pacific R. R.* (1940) 16 Cal.2d 460, 468 [106 P.2d 895], citing Wigmore Evidence, 2d ed., § 1747 et seq.) "The basis for this circumstantial probability of trustworthiness is 'that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief.' " (*Showalter, supra,* 16 Cal.2d at p. 468.) " 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082] (*Poggi*).)

Evidence Code section 1240's codification of the hearsay exception for spontaneous statements provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

■ "Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury. [Citation.]" (*Poggi, supra,* 45 Cal.3d at p. 318.) The trial court's determination of preliminary facts will be upheld if supported by substantial evidence. (*People v. Brown* (2003) 31 Cal.4th 518, 541 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) However, "[w]e review for abuse of discretion the ultimate decision whether to admit the evidence." (*People v. Phillips* (2000) 22 Cal.4th 226, 236 [92 Cal.Rptr.2d 58, 991 P.2d 145].) In performing the task of determining whether the requirements of the spontaneous statement exception are satisfied, the court " 'necessarily [exercises] some element of discretion . . . .' [Citation.] [¶] Because the second requirement relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met [citation]." (*Poggi, supra,* 45 Cal.3d at pp. 318–319.)

"A spontaneous statement is one made without deliberation or reflection. [Citation.] 'The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant.' [Citation.]" (*People v. Raley* (1992) 2 Cal.4th 870, 892–893 [8 Cal.Rptr.2d 678, 830 P.2d 712] (*Raley*).)

Ramirez contends that the evidence does not support the trial court's conclusion that Ana did not have the opportunity to reflect or deliberate prior to making the statements at issue. We conclude that there is not substantial evidence to support the trial court's factual determination that Ana's mental state was not consistent with "detached reflection or deliberation" with respect to her statements concerning the sexual assault, and thus, that the court abused its discretion in determining that the statements Ana made to Guzman, Mujica, and Galvan come within the spontaneous statement exception to the hearsay rule.[4]

---

[4] Ana's statements "it hurts, it hurts" were separately admissible under the state-of-mind exception to the hearsay rule, codified in Evidence Code section 1250, subdivision (a), which provides: "Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule." Pursuant to Evidence Code section 1252, a statement of the declarant's mental or physical condition is inadmissible only if the statement was made " 'under circumstances such as to indicate its lack of trustworthiness.' " (*People v. Escobar* (2000) 82 Cal.App.4th 1085, 1103 [98 Cal.Rptr.2d 696].)

The facts relating to the timeline of relevant events are as follows: Sometime between 2:00 a.m. and 4:30 a.m., Ramirez raped Ana in the car. After the rape but before approximately 4:30 a.m., Ana and Ramirez returned to the hotel room. Ana was clearly upset, but said nothing about the rape to Adrienne or Omar. Sometime after 4:30 or 5:00 a.m., Ana returned to the car with Ramirez so he could drive her home. At some point Ana fell asleep in the car. At approximately 7:00 a.m., Ana awoke in a strange apartment. After Mujica arrived at the apartment, Ana told Mujica that she had been raped. Ana left the apartment and walked back to the Ramada Inn. She did not arrive at the hotel until approximately 8:30 or 9:00 a.m. Sometime after that, Ana told Galvan that Ramirez had raped her.

The People contend that these facts are similar to the facts in *Raley, supra*, 2 Cal.4th 870, in which the Supreme Court concluded that a trial court had properly admitted in evidence statements the victim made about a sexual assault several hours after the attack.

The victim in *Raley* was sexually assaulted and stabbed by the defendant, who dumped the victim and her friend in a ravine before fleeing. (*Raley, supra*, 2 Cal.4th at p. 884.) The court admitted as spontaneous declarations statements the victim made to a man who stayed with her in the ravine while waiting for help to arrive. (*Id.* at pp. 891–892.) In affirming the trial court's decision to admit the victim's statements as spontaneous statements, the Supreme Court noted, "The statements at issue here were made by a young woman who had been bleeding for 18 hours, who had suffered a traumatic head injury, and who was not far from death. In addition, the evidence suggests she was unconscious for part of this period. Although the sexual attack of which she spoke had occurred some hours before her statements, her *physical condition was such as would inhibit deliberation.*" (*Id.* at pp. 893–894, italics added.) The Supreme Court concluded: "We cannot agree that under these circumstances the lapse of time alone deprived Jeanine's statement of spontaneity. Contrary to the suggestion of the court in *In re Cheryl H.* [(1984)] 153 Cal.App.3d 1098, 1130 [200 Cal.Rptr. 789], that a statement cannot be considered spontaneous if more than a few minutes have elapsed, '[n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and *while the reflective powers were still in abeyance.*' [Citation.]" (*Id.* at p. 893, italics added.)

The concurring opinion suggests that Ana's statements are admissible under the analysis in *Raley, supra*, 2 Cal.4th 870. In both cases, the victims

were sexually assaulted, were bleeding, and had been in and out of consciousness. However, the differences between the facts in *Raley* and the facts in this case overshadow the similarities. The victim in *Raley* had suffered a number of life-threatening injuries as a result of the sexual assault in that case. She had been stabbed, had suffered a significant head injury, had bled for 18 hours, and was near death at the time she made the statements at issue. While Ana was clearly in pain and distraught as a result of the sexual assault in this case, the evidence does not support a finding that, as in *Raley*, "her physical condition was such as would inhibit deliberation" (*Raley, supra*, 2 Cal.4th at p. 894). After Ana was assaulted, she returned to the hotel room, took a shower, and asked to be driven home. She got back into the car with Ramirez, where she apparently fell asleep. She awoke in a strange apartment, talked with Guzman and Mujica, related in some detail the events of the previous evening, and told Mujica she had been raped. She then left the apartment and walked for between one and two hours, back to the hotel.

Although Ana was clearly injured and was experiencing a great deal of stress as a result of the sexual assault, her actions after the assault make it clear that neither her injuries nor her mental state were comparable to those of the victim in *Raley*. The evidence does not support the conclusion that Ana's "physical condition was such as would inhibit deliberation."

Nor does the evidence support the conclusion that, as in *Raley*, Ana's " 'reflective powers were still in abeyance' " at the time she made the statements at issue. (*Raley, supra*, 2 Cal.4th at p. 893.) Rather, the evidence indicates not only that Ana was *able* to deliberate or reflect on what had occurred, but that she in fact did so. Although Ana was upset and crying when she spoke with Guzman and Mujica, she was able to relate in detail the events of the previous evening, and told them a number of times that she was worried about what her brother might do to her if he were to find out what had occurred the night before. After she arrived back at the hotel, she asked Galvan to call several of her friends because she needed a ride. She also asked him if she could use the bathroom, and went into the bathroom for at least 10 minutes. When she returned, Galvan asked her a couple of times whether she was okay. It was only after the second inquiry that Ana responded that she had been raped and that she was still bleeding. Ana declined Galvan's offer to call an ambulance, stating that she was frightened of what her brother would do if he were to find out what had happened.

The narrative style as well as the quantity, detail and content of Ana's statements suggest that they were not spontaneous statements made under the stress of excitement without deliberation or reflection, but rather, that they were made after Ana had engaged in a deliberative or reflective process.

Contrary to the suggestion in the concurring opinion, it is not merely that Ana "spoke clearly and distinctly, or was oriented to reality" that leads us to conclude that she engaged in a deliberative process, and thus, that the statements at issue do not come within the hearsay exception for spontaneous statements. (Conc. opn., *post*, at p. 1533.) In addition to these factors, and most important for purposes of our analysis, is the *content* of Ana's statements. In her conversations with Guzman, Mojica and Galvan, Ana stated a number of times that she was worried about what her brother would do if he were to find out what had happened to her. These statements demonstrate that Ana in fact engaged in a deliberative or reflective process as to the subject matter of the statements at issue, and thus establish that her reflective powers were not "*yet* in abeyance." In our view, the fact that Ana actually engaged in a deliberative or reflective process as to the subject matter of the statements at issue is dispositive.

█ In this case, unlike in *Raley, supra,* 2 Cal.4th 870, the evidence establishes that the victim not only had the opportunity to engage in a deliberative process during the time that elapsed between the startling event and the time the statements at issue were made, but that she actually did so. The trial court's finding that Ana's mental state was "inconsistent with any detached reflection or deliberation" is thus not supported by substantial evidence. Under these circumstances, it was an abuse of discretion to admit the statements under the spontaneous statement exception to the hearsay rule.

However, Ramirez was not prejudiced by the trial court's erroneous admission of these hearsay statements. "When the court abuses its discretion in admitting hearsay statements, we will affirm the judgment unless it is reasonably probable a different result would have occurred had the statements been excluded." (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1293 [280 Cal.Rptr. 584].) We conclude that it is not reasonably probable that if the court had not allowed the prosecution to introduce Ana's statements as exceptions to the hearsay rule, Ramirez would not have been convicted of rape of an intoxicated person.

Ana testified about the rape at trial. Thus the jury did not have to rely solely on secondhand statements she made to third parties. Rather, it had the opportunity to hear from Ana directly and to judge her credibility. The statements Ana made to Guzman, Mojica, and Galvan were merely cumulative to Ana's testimony at trial.

Ramirez contends that Ana's credibility was "highly questionable," and that if the hearsay statements had not been allowed in evidence, the jury might have rejected her testimony. He asserts that "[a]bsent her statements to Guzman and Galvan, there was no evidence to corroborate Ana's claims that

appellant had raped her." However, there was a great deal of physical evidence that supported Ana's version of events, including a significant vaginal hematoma, substantial bleeding, swelling and bruising, and a laceration. Additionally, even if the statements Ana made to these witnesses had not been admitted, the witnesses testified as to Ana's demeanor. For example, the clerk noted that Ana was crying and that she looked as though she had been crying for a long time. This testimony supported Ana's version of events. Further, the statements Ana made to Mujica and Galvan were properly admitted as "fresh complaints," i.e., to establish that Ana had made a complaint about the rape. Even though the statements could not be admitted for their truth under this doctrine, the fact that Ana complained about the rape soon after the relevant events served to bolster her credibility. On this record, we cannot say that it is reasonably probable that if the trial court had excluded Ana's statements to third party witnesses about the rape, the outcome of the trial would have been different.

B. *The trial court was not required to instruct the jury with CALJIC No. 4.35 regarding mistake of fact*

Ramirez contends that the trial court erred in refusing to instruct the jury with CALJIC No. 4.35 (Ignorance or Mistake of Fact). Specifically, he contends that there was evidence that he was under the mistaken belief that Ana was not sufficiently intoxicated to be unable to resist the act of sexual intercourse. He claims that the court hindered his defense by failing to instruct the jury with the general instruction regarding mistakes of fact.

During a jury instruction conference, defense counsel requested that the trial court instruct the jury with CALJIC No. 10.65 regarding defendant's belief as to consent in forcible rape, CALJIC No. 10.67 regarding defendant's belief as to age in the crime of unlawful sexual intercourse, and CALJIC No. 4.35, regarding mistake of fact. Defense counsel requested that CALJIC No. 4.35 be given as follows: "An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime. [¶] Thus a person is not guilty of a crime if [he] commits an act or omits to act under an actual [and reasonable belief] in the existence of certain facts and circumstances which, if true, would make the act or omission lawful."

The trial court found the instruction to be cumulative on the ground that the content of CALJIC 4.35 was covered in the more specific instructions provided in CALJIC Nos. 10.65 and 10.67. The court agreed to give CALJIC Nos. 10.65 and 10.67, but denied defense counsel's request to instruct the jury with CALJIC No. 4.35.

According to Ramirez, CALJIC No. 4.35 was necessary to allow him to present a full defense to count 2, rape of an intoxicated person, because there was no other jury instruction regarding mistake as to that particular offense. Ramirez notes that CALJIC No. 10.65 provided an instruction on mistake relating to count 1, and CALJIC No. 10.67 provided an instruction on mistake relating to count 3, but that there was no other mistake instruction relating to count 2. Thus, he contends, CALJIC No. 4.35 should have been given. We disagree.

With regard to count 2, the trial court instructed the jury with CALJIC Nos. 10.02 (Rape of Non-Spouse—Lack of Consent—Lack of Capacity—Intoxicant, Etc.—Unconsciousness)[5] and 1.23.2 ("Prevented From Resisting"—Defined in Rape, Sodomy, Forcible Penetration and Oral Copulation).[6] CALJIC Nos. 10.02 and 1.23.2 accurately set forth the elements required for a conviction under section 261, subdivision (a)(3).

These instructions informed the jury that it could find Ramirez guilty on count 2 only if it found beyond a reasonable doubt that Ramirez knew, or reasonably should have known that Ana was prevented from resisting due to intoxication. Ramirez contends that the mistake of fact defense set forth in CALJIC No. 4.35 "is broader than the fourth element of the offense of rape of an intoxicated person." We disagree.

---

[5] The trial court's instruction on CALJIC No. 10.02 provided: "Defendant is accused in Count Two of having committed the crime of rape in violation of section 261, subdivision (a)(3) of the Penal Code. [¶] Every person who engages in an act of sexual intercourse with another person not the spouse of the perpetrator, when that other person is prevented from resisting by any intoxicating or anesthetic substance or any controlled substance, and this condition was known or reasonably should have been known by the accused, is guilty of the crime of rape in violation of Penal Code section 261, subdivision (a)(3). [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A male and a female engaged in an act of sexual intercourse; [¶] 2. That two persons were not married to each other at the time of the act of sexual intercourse; [¶] 3. The alleged victim was prevented from resisting the act by an intoxicating substance; and [¶] 4. This condition was known, or reasonably should have been known by the accused."

[6] The trial court's instruction on CALJIC No. 1.23.2 provided: "In the crime charged in Count Two, an essential element of the crime is that the alleged victim was prevented from resisting the act by an intoxicating substance. 'Prevented from resisting' means that as a result of intoxication, the alleged victim left [sic] the legal capacity to give 'consent.' Legal capacity is the ability to exercise reasonable judgment, that is, to understand and weigh not only the physical nature of the act, but also its moral and probable consequences. [¶] In making this determination, you should consider all the circumstances surrounding the act, including the alleged victim's age and maturity. It is not enough that the alleged victim was intoxicated to some degree, or that the intoxication reduced the person's sexual inhibitions. Impaired mentality may exist and yet the individual may be able to exercise reasonable judgment with respect to the particular matter presented to his or her mind. Instead the level of intoxication and the resulting mental impairment must have been so great that the alleged victim could no longer exercise reasonable judgment concerning that issue."

█ Ramirez correctly asserts that CALJIC No. 4.35 "encompasses 'an actual and reasonable belief in the existence of certain facts and circumstances which, if true, would make the act or omission lawful.' " However, he goes on to contend that a mistake of fact on his part "would have negated the fourth element of the offense [of rape of an intoxicated person]." Ramirez further contends that there was sufficient evidence to support a finding that he did not have knowledge of Ana's inability to resist or consent "due to a mistake of fact regarding Ana's level of intoxication and/or her ability to resist or consent as a result of her intoxication," and that based on this evidence of his "mistake," the trial court should have instructed the jury with CALJIC No. 4.35.

Ramirez is incorrect in asserting that a finding of mistake would have negated the fourth element of the offense. The fourth element of the offense required the jury to find that Ramirez *knew, or reasonably should have known, that Ana was unable to resist due to her intoxication.* It would not be consistent for a jury to find that Ramirez "reasonably should have known" that Ana's level of intoxication prevented her from resisting, and at the same time find that Ramirez held a "reasonable belief" that she was able to resist or give consent. A belief that the victim was able to resist could not be reasonable if the perpetrator "reasonably should have known" that the victim was unable to resist. The trial court was correct in instructing the jury with CALJIC Nos. 10.02 and 1.23.2, and did not err in declining to instruct the jury with CALJIC No. 4.35.

C. *The trial court did not abuse its discretion in declining to grant Ramirez probation*

Before sentencing Ramirez, the trial court considered the probation report, Ramirez's statement of mitigation in support of probation, a psychological evaluation of Ramirez conducted by psychologist Dr. Raymond G. Murphy, and letters submitted in support of Ramirez. The court also heard from Ana, who told the court that her life had "changed," that she "felt dirty," and that she had trouble sleeping because of recurring dreams about being raped. She also indicated to the court that she was fearful that Ramirez might "do something" to her when he is released.

The trial court found that Ramirez was statutorily eligible for probation. The court also noted that because of the nature of Ramirez's crime, prior to actually granting probation, the court would have to follow the requirements of section 1203.067. The court weighed the factors set forth in California Rules of Court,[7] rule 4.414(a), and concluded that Ramirez should not be

---

[7] Further rule references are to the California Rules of Court.

granted probation. Ramirez contends that the trial court abused its discretion by declining to order a diagnostic study under section 1203.067, prior to determining whether or not he should have been granted probation. We disagree.

 "The trial court enjoys broad discretion in determining whether a defendant is suitable for probation." (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1256 [42 Cal.Rptr.3d 444].) "To establish abuse, the defendant must show that, under the circumstances, the denial of probation was arbitrary or capricious. [Citations.] A decision denying probation will be reversed only on a showing of abuse of discretion. [Citation.]" (*Id.* at p. 1257.)

Rule 4.414 provides the criteria a court is to consider when making the decision whether to grant or deny probation.[8] Ramirez argues that "[t]here were several factors in the record indicating that appellant's case might be an appropriate one for a grant of probation." However, even if there were several mitigating factors that might weigh in favor of probation, this does not necessarily mean that the trial court abused its discretion in deciding against

---

[8] Rule 4.414 provides: "(a) Facts relating to the crime, including:

"(1) The nature, seriousness, and circumstances of the crime as compared to other instances of the same crime.

"(2) Whether the defendant was armed with or used a weapon.

"(3) The vulnerability of the victim.

"(4) Whether the defendant inflicted physical or emotional injury.

"(5) The degree of monetary loss to the victim.

"(6) Whether the defendant was an active or passive participant.

"(7) Whether the crime was committed because of an unusual circumstance, such as great provocation, which is unlikely to recur.

"(8) Whether the manner in which the crime was carried out demonstrated criminal sophistication or professionalism on the part of the defendant.

"(9) Whether the defendant took advantage of a position of trust or confidence to commit the crime. [Subd. (a) as amended eff. Jan. 1, 1991.]

"(b) Facts relating to the defendant, including:

"(1) Prior record of criminal conduct, whether as an adult or a juvenile, including the recency and frequency of prior crimes; and whether the prior record indicates a pattern of regular or increasingly serious criminal conduct.

"(2) Prior performance on probation or parole and present probation or parole status.

"(3) Willingness to comply with the terms of probation.

"(4) Ability to comply with reasonable terms of probation as indicated by the defendant's age, education, health, mental faculties, history of alcohol or other substance abuse, family background and ties, employment and military service history, and other relevant factors.

"(5) The likely effect of imprisonment on the defendant and his or her dependents.

"(6) The adverse collateral consequences on the defendant's life resulting from the felony conviction.

"(7) Whether the defendant is remorseful.

"(8) The likelihood that if not imprisoned the defendant will be a danger to others."

granting probation. Here, the trial court concluded that Ramirez's crime was particularly serious. The court noted that Ana was especially vulnerable because of her age and because she was unconscious during the rape. The court also considered the fact that Ramirez inflicted physical injury on Ana, that he took what the court described as "aggressive and an assaultive [*sic*] advantage" of her, and that Ana "obviously suffered psychological trauma and still continues to suffer that psychological trauma." The record also establishes that Ramirez was already on probation at the time of this offense as a result of multiple misdemeanor offenses for driving under the influence. The court weighed all of these factors against the factors in mitigation, including Ramirez's assertions that his perception may have been influenced by the significant amount of alcohol in his system, that this offense was not more serious than comparable offenses involving intoxicated victims because there was nothing to support Ana's testimony that she was unconscious,[9] that he did not use a weapon, and the fact that, according to Ramirez, Ana had led him to believe that she was 20 years old. After considering all of these factors, the court concluded that "probation is not an acceptable alternative to prison" in Ramirez's case.

There is abundant evidence supporting the trial court's conclusion that this rape was an aggravated one, including the physical evidence regarding Ana's injuries, as well as the fact that Ana was a particularly vulnerable victim. Based on this record, we cannot conclude that the trial court acted arbitrarily or capriciously in denying Ramirez probation.

■ With respect to Ramirez's suggestion that the trial court should have ordered a diagnostic evaluation pursuant to section 1203.067[10] in order to

---

[9] Ana's testimony that she lost consciousness was sufficient evidence to support the conclusion that Ana was unconscious during at least some portion of the rape. Ramirez's contention that there was no evidence to support her claim that she was unconscious is curious, considering the fact that her claim, if believed, is sufficient evidence, in and of itself, that this is what occurred.

[10] Section 1203.067, subdivision (a) provides: "Notwithstanding any other law, before probation may be granted to any person convicted of a felony specified in Section 261, 262, 264.1, 286, 288, 288a, or 289, who is eligible for probation, the court shall do all of the following:

"(1) Order the defendant evaluated pursuant to Section 1203.03, or similar evaluation by the county probation department.

"(2) Conduct a hearing at the time of sentencing to determine if probation of the defendant would pose a threat to the victim. The victim shall be notified of the hearing by the prosecuting attorney and given an opportunity to address the court.

"(3) Order any psychiatrist or psychologist appointed pursuant to Section 288.1 to include a consideration of the threat to the victim and the defendant's potential for positive response to treatment in making his or her report to the court. Nothing in this section shall be construed to require the court to order an examination of the victim."

properly determine whether or not to grant him probation, Ramirez contends that the "unique facts" of his case required that the trial court order a section 1203.067 diagnostic evaluation because the "court could not make an informed exercise of its discretion" without one. However, as we have already concluded, the trial court properly exercised its discretion in concluding, prior to ordering a diagnostic evaluation pursuant to section 1203.067, that Ramirez should not receive probation. A section 1203.067 diagnostic evaluation becomes necessary only if, after weighing the criteria listed in rule 4.414, a court is inclined to order probation rather than prison time. When the court has no intention of granting probation, and the record adequately supports such a determination, there is no need for a section 1203.067 diagnostic evaluation. (Cf. *People v. Thompson* (1989) 214 Cal.App.3d 1547, 1549 [263 Cal.Rptr. 272] [concluding that section 288.1 report is not mandated in every case involving a lewd or lascivious charge where defendant is eligible for probation, but only in those cases in which a trial court is inclined to grant probation].)

After reviewing the probation report, Dr. Murphy's report, a statement of mitigation in support of probation, and various letters in support of Ramirez, the trial court was not inclined to grant Ramirez probation. This conclusion was well within the court's discretion. The trial court thus had no duty to order a diagnostic evaluation under section 1203.067, subdivision (a).

IV.

DISPOSITION

The judgment and sentence of the trial court are affirmed.

Haller, J., concurred.

**BENKE, Acting P. J.,** Concurring.—The majority concludes the statements Ana H. made in the Guzman apartment and to Alejandro Galvan at the Ramada Inn are inadmissible as spontaneous declarations because, in the opinion of my colleagues, Ana was at times able to reflect and express herself in an understandable manner. In so ruling, they reject application of the law as set by our state Supreme Court and create a rule of law at variance from that court.

*Spontaneous Declarations*

Although they are factors in determining spontaneity, the nature and content of a statement, lapse of time between the described event and

statement, and even whether the statement was elicited through direct questioning are *not determinative*. They are solely indicators of the mental state of the declarant. (*People v. Farmer* (1989) 47 Cal.3d 888, 903 [254 Cal.Rptr. 508, 765 P.2d 940]; *People v. Brown* (2003) 31 Cal.4th 518, 541 [3 Cal.Rptr.3d 145, 73 P.3d 1137]; see also *People v. Raley* (1992) 2 Cal.4th 870, 893 [8 Cal.Rptr.2d 678, 830 P.2d 712].) With respect to the nature and content of the declarant's statements, our Supreme Court observes "the fact that the declarant has become calm enough to speak coherently also is not inconsistent with spontaneity. [Citations.] To conclude otherwise would render the exception virtually nugatory: practically the only 'statements' able to qualify would be sounds devoid of meaning." (*People v. Poggi* (1988) 45 Cal.3d 306, 319 [246 Cal.Rptr. 886, 753 P.2d 1082].)

In short, according to the Supreme Court, a declarant can be lucid, oriented and clear in speech, i.e., reflect, and still have a mental state that satisfies application of the exception. Moreover, as our Supreme Court instructs us, in making the determination of this mental state it may be necessary to consider the age of the declarant, the maturity, life experiences and physical and mental conditions, such as being drunk, tired or injured, in shock or fear, or whether suffering from a state of unconsciousness. (See generally, *People v. Raley*, *supra*, 2 Cal.4th at pp. 893–894; also see *People v. Costa* (1953) 40 Cal.2d 160, 168 [252 P.2d 1].)

My colleagues determine otherwise. Even in the face of clear direction to the contrary, they declare that for purposes of the spontaneous declaration exception the nature and content of the declarant's statements are *dispositive* of the declarant's mental state. The question is not, however, whether the declarant reflected, spoke clearly and distinctly, or was oriented to reality. It is whether given the multiple factors which may be involved, which may *include* the language used, the declarant's mental and physical condition are such as to render the statements trustworthy. (See *People v. Raley, supra*, 2 Cal.4th at p. 894.) Notably, my colleagues apply a spontaneous declaration rule devoid of all but a passing reference to the factors affecting Ana's mental state, and appear to have limited *People v. Raley*, where reflection occurred, to its facts. The majority thus encourages a rather dramatic restriction on the current law of spontaneous declarations. It is a restriction that for me runs too close to case law disapproved in *People v. Raley, supra*, 2 Cal.4th at page 893.

Nowhere is the majority's errant restriction more obvious than in its treatment of Ana's physical and mental state during the two-hour walk from the Guzman apartment to the Ramada Inn. The majority summarizes the walk

as a period of time during which Ana was able to think and reflect. The majority neglects as part of its analysis to mention much less consider that this was an attempt by a confused and lost 16-year-old to get back to where she had last seen her friend Adrienne. During the walk she was badly injured and hemorrhaging, and she was in such pain that she was able to take only 10 to 15 steps at a time. This ordeal must have been visibly torturous, as passersby stopped in an attempt to help the girl. Consideration of Ana's mental state during this two-hour ordeal explains the mental and physical condition she was in at the time she made her statements to Galvan. Likewise, the majority appears to view Ana's time at the Guzman apartment simply as a period of time when she had a discussion and mentioned her brother would be angry. In its analysis the majority fails to consider what Ana's mental state was when after several hours of unconsciousness she awoke at a stranger's apartment, hemorrhaging and in substantial pain. She was also very disoriented and confused about where she was and how she got there. In the midst of this situation, trying to figure out where she was and find an explanation for what she was doing there understandably required some history of events as she knew them to be. The pressure caused by the wrath of her brother did not reduce but obviously increased the stress.

### Discretion

In determining whether the declarant's state of mind meets the test of an excited utterance, the trial court's discretion is extremely broad. Particularly is this so with respect to whether the declarant's statement is spontaneous. My colleagues note this, but do not further note that in *Poggi* the court ended its discussion of the law relating to this element by noting just how strong and broad that discretion is. As the court in *Poggi* observes: "Indeed, Dean Wigmore goes so far as to urge that the issue should be left 'absolutely to the determination of the trial court.' " (*People v. Poggi, supra*, 45 Cal.3d at p. 319.) This observation clearly reflects the strength of the determination made by the trial court and why courts of review should be highly deferential to that determination.

If my colleagues are correct that as a matter of law the existence of a declarant's understandable language and reflection negates completely the use of the spontaneous declaration exception, the use of the substantial evidence test has certainly been eroded. Moreover, as is evident, a trial judge's discretion is now limited; so much so that the majority feels no need to examine the factors supportive of the trial court's ruling.

Because the majority's factual discussion is somewhat truncated, I note the record reflects the following in support of the trial court's ruling:

On January 17, 2004, Ana, a 16-year-old, was in the 10th grade. She lived with her 24-year-old brother in Vista. At approximately 2:00 a.m. Ana, who had never been drunk or engaged in sexual intercourse, was given tequila and then forcibly raped by Guillermo Ramirez on the backseat of a car. The rape immediately resulted in such a serious injury to Ana's vaginal area that she hemorrhaged. So severe was the injury that by the time medical attention was given, Ana could not be medically examined due to development of a "very significant injury," a hematoma, on the entire side of her labia. She was unable to walk normally for 10 to 15 days after the attack.

During the approximately five to seven hours following the rape, when Ana was in this physical condition, the following occurred:

After the rape, between 4:30 and 5:00 a.m., Ramirez took Ana to the room occupied by Omar and Adrienne at the Ramada Inn. She took a 10-minute shower and emerged bleeding and crying. Her bath towel and the tub were soiled with blood. When Adrienne asked what happened, Ana said she did not know. Adrienne told her to calm down and that Omar was going to call her brother to tell him Ana was staying overnight with a friend. Ana told Adrienne she wanted to go home but she was not allowed to leave the room. Omar grabbed Ana by the shoulders and threw her on the bed and Ramirez stood in the doorway of the bedroom so she could not leave.

After Ana begged him to take her home, Ramirez agreed. However, he did not take her home. Once in the car, Ramirez pulled to the side of the road and again tried to force himself on Ana by trying to kiss her. When she resisted, Ramirez told her to get out of the car. She got out, but because she was in so much pain she was unable to walk. She sat down and cried.

Ramirez returned and told her to get back in the car promising he was "not going to do anything anymore." Still, Ramirez did not take Ana home. She fell asleep and he took her, unconscious, to the apartment of people Ana did not know. When she awoke about 7:00 a.m., she was lying in a bed, confronted by strangers, including Jessica Guzman. Guzman, who had never seen Ana before, observed the girl looked scared and "really, really bad." Ana was confused and disoriented, having no idea where she was or how she got there.

She thought she was "in her friend's apartment." Apparently she believed she was back at the Ramada Inn. She said the bed was "in a different place" and the bathroom was "very different." Guzman instructed Ana to get up. Ana did so. As she walked to the bathroom, Ana was holding her groin area and walking very slowly.

Guzman's aunt, Antonieta Mujica, came to the apartment when she received a call for help. She arrived to find Ana on the bed, crying and holding her stomach. She observed that Ana was not acting in a normal manner and seemed confused. Ana told Mujica she had been raped and hurt. When Mujica said she would call the police and get help, Ana fled from the apartment, yelling she had not stolen anything.

After leaving the Guzman apartment, Ana did not know where in San Marcos she was. She found a street that looked familiar and then at a car wash got directions to the Ramada Inn. For approximately two hours thereafter, Ana walked alone, in pain and crying while trying to find her way back to the hotel. She walked very slowly and stopped to rest every 10 or 15 steps. People passing by her stopped and offered to help her. She declined the offers, fearful what had happened to her would happen again.

At approximately 8:30 or 9:00 a.m., Ana finally arrived back at the Ramada Inn. She discovered Omar and Adrienne were gone and the room key had been turned in. Alejandro Galvan, the clerk, saw she was walking slowly and that she looked scared. Her eyes were red, as if she had been crying. She asked to use the bathroom, and when she did she saw that she was still bleeding a lot. When she returned to Galvan, he asked her several times if she was okay. She said: "I'm not okay because I've been raped." Galvan offered to call an ambulance, but Ana declined. During attempts to call Ana's friends to come and help her, she told Galvan what happened the night before, including that she had been raped by appellant. She started crying and shaking. Galvan told Ana she could go back to the room she was in the night before. As she went to the room, Galvan observed Ana could barely walk. It took her some time to get to the room, which was at the opposite end of the hotel.

Eventually, Galvan was able to contact one of Ana's friends, who took her to the home of a person Ana had lived with before moving in with her brother. This person called the police.

On this record the trial court was entitled to conclude that Ana never reached a point where she was *not* in a state of extreme physical pain, confusion, unconsciousness, emotional distress and/or excitement. It was also reasonable for the trial court to believe Ana and witnesses who supported her complaint.

While the majority might evaluate the facts differently, the record supports the trial court's determination Ana was in such stress and excitement due to the rape and successive traumas that her statements implicating appellant were an unreflective and sincere expression of her actual belief.

Substantial evidence supports the trial judge's ruling.

Appellant's petition for review by the Supreme Court was denied February 14, 2007, S148209.