Filed 5/7/13  P. v. Langford CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JEFFERY LANGFORD,<br><br>    Defendant and Appellant. | B239485<br><br>(Los Angeles County<br>Super. Ct. No. SA068712) |

APPEAL from a judgment of the Superior Court of Los Angeles County. James R. Dabney, Judge.  Affirmed.

Jolene Larimore, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Billderback II, and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

A jury convicted defendant Jeffery Langford on multiple counts of first degree burglary, first degree residential robbery, false imprisonment of an elder, cutting a utility line, criminal threats, and assault by means likely to produce great bodily injury. The case concerned a series of home invasions in which elderly women were robbed. On appeal, defendant asserts insufficient evidence supported the jury's verdicts on the issue of identity and the trial court erred in admitting testimony based on the excited utterance exception to the hearsay rule. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The information contained 39 counts. Although the People charged defendant in connection with crimes against 13 victims, trial proceeded only as to 12, and the jury convicted defendant in connection with only seven of the victims.[1] The jury found defendant not guilty on counts associated with four of the victims, and could not reach a verdict on charges associated with one other victim. We set forth only the evidence as to the seven victims for which there were convictions. We summarize the evidence in accordance with the usual rules on appeal. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.)

### Lois S.

On June 7, 2008, 93-year-old Lois S. was living alone in west Los Angeles. Her son arrived at her house around 7:20 a.m. Lois met him at the door. She was distraught, crying, and could barely talk. Lois told her son she had been robbed. A man came into the house around 2:00 a.m., while she was sleeping. He held his hand over her face and told her to stay still and not to make noise or he would hurt her badly. Lois stayed in bed. She described the intruder as a tall black man wearing a mask. The man returned to the bedroom, told Lois not to make any noise, and warned her not to call the police. While Lois lay in bed, she heard noises that sounded like the house being ransacked. At around

---

[1] Prior to trial, the court granted a defense motion to dismiss counts 31, 32, and 33 under Penal Code section 995, on the ground that insufficient evidence of identification was presented at the preliminary hearing.

2

4:00 or 4:30 a.m., she crawled from her bedroom on her knees and peeked around the door to see if the man was still in the house. She crawled further but did not see him. She tried to call the police, but her phones had been dismantled and a "life alert" emergency response device she wore around her neck would not work. Lois's son saw that the house was in total disarray, with furniture overturned, drawers emptied, and clothes thrown on the floor. Silverware and jewelry were missing from Lois's house.

A police officer who responded to Lois's house noticed a screen was removed from a back bedroom window. There were marks on the windowsill where the window had been pried up. Shoe prints were recovered from outside the back bedroom window and from a dresser inside the back bedroom. Lois told police the intruder was wearing a black hat, gray sweatshirt, and black pants.

### Carol H.

On June 14, 2008, 79-year-old Carol H. was living alone in west Los Angeles. Around 3:00 a.m., she heard noises outside her bedroom. She investigated but saw nothing. Minutes later she saw light from a flashlight approaching her bedroom, then a figure in the doorway. When she screamed, a man entered the room, held her down, and put his hand over her mouth. He was wearing a black ski mask and black knit gloves. She assumed the man was black because she could see an area around his eyes. He was wearing a black knit T-shirt over a white shirt, and black pants. His shoes were shiny and black, "kind of running-shoe-like."

The man told her if she was quiet and cooperated, he would not hurt her, but if she screamed more he would kill her. He asked if she had any jewelry or silverware. He sat next to Carol on the bed and searched the drawers in her nightstand, then searched through the drawers of a dresser in the bedroom. He made Carol follow him into the bathroom. The man searched all of the bathroom drawers and cabinets, then went to another bedroom, with Carol following. The man told Carol to sit on the bed while he searched file cabinets, a dresser, and a closet.

The intruder asked Carol where she kept her money. She told him she kept it in a fanny pack; he told her to get the pack and bring it to him, which she did. The man told Carol to sit on the bed, then he searched the fanny pack. He took everything out, including around $30 or $40, threw Carol's identification on the bed when she asked for it, then returned the money to the fanny pack. The man asked for silverware. He searched the kitchen drawers, cupboards, refrigerator, and freezer. The man said, "I can't believe that there isn't anything here." He searched every cupboard and drawer in Carol's den while she sat at the dining room table, then he searched everything in her living room while she sat in a reclining chair. He took nothing from the kitchen, den, dining room, or living room.

After he had searched the living room, the man told Carol to go into her bedroom. He followed and told her to sit for 10 minutes. He said he had disabled her telephone so she could not call the police. He told her he would leave and if she followed him he would kill her. He left and closed the bedroom door. Carol had a "fat lip" from where the man had held his hand over her mouth. When she got up 10 minutes later to call the police, she realized there was no telephone receiver on the wall in the kitchen. Two days after the incident, she found her telephone receiver in the freezer.

The incident lasted between 45 minutes and one hour. The man was terse, polite, and forceful. He did not yell. Carol noticed the man used "very excellent English." He did not tie her up or restrain her in any way. She told police the man was six feet tall and weighed around 200 pounds. She described him as a young man, 25 years old, with light brown eyes.[2] She said he had a radio with an antenna sticking out of his back pocket.

A responding police officer saw that a bathroom window was open in Carol's house. He also saw a shoe print and partial shoe print on the toilet seat. Outside, he saw the base of a bird bath below the bathroom window. A detective described Carol's house as ransacked "[t]o some degree, but not to the degree of previous ones I had been to."

---

**2**    Defendant was 53 years old in 2008.

*Marjorie D.*

At 2:30 a.m. on July 1, 2008, 79-year-old Marjorie D. was watching television in her west Los Angeles home. She heard a scratching noise on the screen by the open window in her bedroom. A man burst through the window and the screen. He told Marjorie to sit on the edge of the bed. He was wearing a ski mask made of a silky fabric, black clothes and shoes, and black gloves. His shoes were a shiny, smooth patent leather. Marjorie thought he might be a light-skinned black man, possibly of "mixed nationality." The man asked Marjorie for money. She told him she had money in her purse in another room. The man took Marjorie by the hand, and led her into the breakfast room to get her purse. They returned to the bedroom. The man waited while Marjorie got out her wallet and removed money, which she gave to him. He looked around, then opened containers on Marjorie's dresser, and every drawer in the bedroom. He emptied a paper bag and put jewelry he found in the bag. While searching a closet, the man found a duffle bag; he transferred items from the paper bag to the duffle bag. The duffle bag had a label which read "Parker Randles." The bag had belonged to Marjorie's best friend's son, Parker Randles. The man emptied Marjorie's purse and took her cell phone. He searched a chest and took a charm bracelet and other pieces of jewelry.

The man asked Marjorie about her next door neighbor.[3] He then searched another chest, opening each drawer, but he took nothing. He asked Marjorie if she had any sterling silver. He led Marjorie by the hand into the dining room. He looked through a sideboard and cupboard but took nothing. He asked Marjorie where she kept her silverware. When she told him it was in the kitchen, he asked her to take him there. In the kitchen, the man told Marjorie to sit down in the dining room. He searched the silverware in the kitchen. After searching the kitchen, the man told Marjorie to return to the bedroom and get into bed. The man accompanied Marjorie to her bedroom and sat in a chair next to her bed. He told Marjorie he wanted cash, or "we're going to have sex."

---

[3]     The next door neighbor was Robyn L. Although defendant was charged with several crimes associated with a robbery at Robyn's house, the jury acquitted him on those charges.

Marjorie indicated they would not and called the man a thief. When he protested he was not a thief, she told him to leave her house. The man tied Marjorie's wrists and ankles with lace he took from one of Marjorie's dresser drawers. He told her not to move for 15 minutes. Marjorie cut herself free with scissors after she heard the man leave. She tried calling the police from her house phone but heard only static.

The intruder was in Marjorie's house around 45 minutes. He did not yell. He was "well-spoken," and "more or less soft-spoken." He did not threaten to hurt Marjorie. Marjorie thought he was approximately six feet two inches tall, of muscular build, and 30 years old.

A police detective who responded to the scene saw a window with a missing screen. One bedroom appeared to have been ransacked. Marjorie told the detective she had seen a ladder leaning against her house. Marjorie also told the detective the intruder had a small flashlight.

### Joanne M.

On July 2, 2008, 75-year-old Joanne M. left her home in west Los Angeles. She was gone for over a month. On July 3, 2008, Joanne's neighbor noticed window screens sitting on the front porch, and one of the windows was ajar. She called the police. Joanne's house was a "terrible mess" and a "complete shambles." Items were strewn about. Drawers were open and emptied. Police officers saw pry marks on several of the windows, window screens that had been removed, and cuts on some of the window screens. One officer saw that a front window was open, and an outdoor chair sat under the open window. Officers also noticed a window in the rear of the home was missing a window screen, and a recycling bin was underneath the window. There was dirt on the bin, a shoe print on the bin, and a shoe print in the dirt next to the bin.

When Joanne returned in August 2008, she discovered cash, jewelry, and silver dishes were missing from the house. A trash bin had been moved from its normal location to the back of her house underneath a window. Several window screens were on the ground.

6

*Ernestine A.*

On July 10, 2008, 79-year-old Ernestine A. was sleeping in her home in west Los Angeles when a man woke her up by touching her with a gun. The man told Ernestine to "bring the gold," or he would kill her, all while pointing the gun to her neck. He asked for money. Ernestine told the man she did not have gold or valuables except $50 in her purse. The man said he would take the $50. He was wearing a mask. He took a telephone and threw it. He did not stay in Ernestine's house long and appeared to be afraid of her dogs. He did not lead her around her house to different rooms.

Ernestine told a police officer the man was a Hispanic male around six feet tall, and 200 pounds. She heard an accent when the man spoke. She said she felt an object on her neck but did not specify a weapon or mention a gun. She said the man was in her house around 10 minutes. Police officers saw a window screen on the ground outside Ernestine's house. They observed pry marks on the window frame. On the other side of the window, inside the house, police found a shoe print.

*Marion N.*

On July 18, 2008, 86-year-old Marion N. was living alone in Santa Monica. At 3:00 a.m., she saw a man coming down the hallway, carrying a regular-sized flashlight. She asked what he was doing in her hallway. He told her he would not hurt her and just wanted her money. Marion gave the man money from her purse. The man's face was completely obscured with a covering that was tucked into his shirt. He was wearing gloves that fit his fingers and went into his shirt sleeves. She could not determine his race or ethnicity. His clothes were dark.

The man asked if she had diamonds or gold jewelry. She told him there was jewelry in a bathroom drawer. Marion followed the man into the bathroom where he removed jewelry from the bathroom drawer. He asked if Marion had other jewelry; she told him there was jewelry in the bedroom. In the bedroom, the intruder removed a pillowcase from a pillow and stuffed her jewelry inside. He searched every drawer in the bedroom and took all jewelry he found while Marion stood in the bedroom. They went to the den. The man asked again if Marion had money, so she gave him money from a

7

cabinet in the den.  In the kitchen, the man took a ring and a watch sitting on the counter.  In the dining room, the man was interested in a sterling silver teapot and asked if Marion had any other pieces.  Marion gave the intruder the key to her garage, where she said there were other silver dishes.  The man made her sit in the living room while he went to the garage.  When he returned, he put additional silver items in another pillowcase and set them in the living room.  He did not take the silver items when he left the house.

The man said he was going to leave.  He told Marion to return to the back bedroom.  He directed Marion to lie on the bed, then he tied her up with a long-sleeved blouse.  He told her to stay there, do nothing, and he would leave shortly, but she should not move for a half an hour.  It was 4:30 a.m.  At some point, the man called to Marion that he would be in the house for another 10 or 15 minutes.  The man had pulled a phone in the bedroom out of the wall.

During the incident the man told Marion if she did not do what he wished he would kill her.  Marion told a responding police officer the man was of medium height and slender build.  Although she did not know the intruder's race, she believed he was white due to the way he spoke.  The officer saw screens removed from several windows of Marion's home.  There was a dirty or muddy shoe print on the carpet in the guest bedroom.  Power cords from a television and accessory cables were pulled out.  Marion told the officer the man was wearing a "a form-fitting covering," not a ski mask.  A detective who reported to the scene saw shoe prints in the dirt near a window screen resting against wall of the house.  A table at the back of the house also had a partial shoe print on its surface.  The detective saw pry marks on two of the windows of the house.

### Marguerite H.

In the early morning hours of August 8, 2008, 79-year-old Marguerite H. was sleeping in the house where she lived alone in Santa Monica.  She woke up to find a knee in her back and hands holding her face.  A male voice told her not to talk or scream, and to take off her rings and earrings.  The man took them.  The man had Marguerite get out of bed and follow him into the living room.  He was wearing a black ski mask, black

gloves, black clothes, and black shiny shoes Marguerite described as patent leather, with a design on the side.  He had a small, black flashlight.

He pulled out a chair and directed Marguerite to sit behind a desk.  The man rifled through the desk, taking money and throwing everything else on the floor.  He asked Marguerite for a pillowslip and took two.  They went into a bedroom; the man looked around but did not find anything he wanted.  As the man went from one place to another in the house, he made Marguerite follow him.  Once or twice, the man slapped Marguerite in the face.  He asked her for jewelry and money.  At one point, Marguerite told the man she had to use the bathroom.  He stood in the bathroom door and waited.  Marguerite asked the man how he got into the house.  He showed her how he entered through a window in the dining room.

In the middle bedroom of the house, the man pulled out drawers but took nothing.  In the back bedroom, the man made Marguerite sit on the bed while he searched her dresser drawers.  In a closet, the man broke a lock on a chest of drawers and searched them.  He took bracelets and jewelry from the chest.  Marguerite noticed the intruder's screwdriver on the bed.  She noted it had the longest blade she had ever seen on a screwdriver, and a red and yellow handle.  She picked it up and tried to stab the man in the stomach.  The intruder grabbed Marguerite by the neck and choked her, but let her go.

Marguerite and the man returned to the living room.  He sat her at the desk, then took her into the bedroom and told her to sit on the end of the bed.  He tied her hands and legs with extension cords.  He told Marguerite to sit for 15 minutes and left the bedroom.  He had taken jewelry and money from Marguerite's home.  The incident lasted two hours.  Although the man's face was covered except for his eyes, he stooped over once and Marguerite saw his neck.

Marguerite told police the man was a black male in his 20's or 30's.  She reported he was between five feet seven inches and five feet ten inches tall, and weighed 180 or 200 pounds.  Marguerite also told police the man was wearing black clothing and black tennis shoes with a silver diagonal or wavy design.  He carried a flashlight and a screwdriver, and he wore gloves and a mask.  Marguerite was unable to identify the man

9

from a photographic lineup that included defendant's picture. She did however identify a photograph of defendant's shoes as resembling the shoes the intruder wore. Marguerite said a screwdriver and flashlight in other photographs looked like the intruder's screwdriver and flashlight.

### Other Victims

At trial, the People also offered evidence regarding home invasions at the homes of Evangeline B., Evelyn J., Ida G., Robyn L., and Jeanne A.

### Police Investigation

In August 2008, a special investigations section of the Los Angeles Police Department was assigned to conduct surveillance on defendant. The detectives began surveillance at defendant's residence in Los Angeles. On the evening of August 9, detectives followed defendant to Santa Monica where he slowly circled a residential area for 30 minutes, stopping periodically, and going into bushes. On August 10, detectives again followed defendant to a residential area in Santa Monica. On August 13 and 16, defendant drove around residential areas in Santa Monica between 20 minutes and two hours.

On August 22, defendant left his residence at around 2:10 a.m. Detectives followed him to a residential area in Santa Monica. They saw him get out of his car. He went into the front yard of a house, then left. A detective saw him walking quickly on the sidewalk, sweating, and holding a large screwdriver with a long blade. He was wearing dark clothes. On the sidewalk of the street where defendant had been, police found a ski mask. Police followed defendant after he drove away, eventually stopping him. He was wearing shiny black sneakers.

Police recovered a bracelet from defendant's truck. In defendant's apartment, police found a jewelry cleaning kit and a jewelry magnifying glass. In the car police had seen defendant drive during surveillance, detectives found, among other things, a screwdriver, two pairs of gloves, a flashlight, and a duffle bag. The duffle had a label that read "Parker Randles." Marguerite identified a silver bracelet police recovered as hers.

10

Linda French, an employee in the scientific investigation division of the police department, testified at trial. Based on a comparison analysis, French testified the pry marks at the homes of Lois, Joanne, and Ernestine, could have been made by the screwdriver recovered from defendant's car, or another similar tool. French also concluded footwear impressions captured at the homes of Marion, Joanne and Ernestine could have been made by defendant's shoes, although they also could have been made by a similar shoe. An impression recovered from Lois's house was from a shoe of similar size and design as defendant's shoe. French concluded a footwear impression captured at Carol's home was made by defendant's left shoe, due to accidental characteristics. Other footwear impressions from Carol's home suggested they were made by shoes similar in size and design to defendant's shoes.

### *Jury Verdicts*

The jury found defendant guilty of first degree burglary in connection with the Lois S., Carol H., Marjorie D., Joanne M., Ernestine A., Marion N., and Marguerite H. incidents. (Pen. Code, § 459.) As to Lois, Marjorie, Ernestine, Marion, and Marguerite, the jury found true an allegation that a person was present in the commission of the burglary. The jury further found defendant guilty of first degree robbery in connection with the Lois, Carol, Marjorie, Ernestine, Marion, and Marguerite incidents. (§ 211.) The jury found defendant guilty of cutting a utility line in connection with the Lois and Marguerite incidents (§ 591). Defendant was further convicted of making criminal threats against Carol, Marion, and Marguerite (§ 422); false imprisonment of an elder as to Marjorie and Marion (§ 368, subd. (f)); and assault with force likely to produce great bodily injury against Marguerite (§ 245, subd. (a)(1)). As to each crime, the jury found true an allegation that the victim was over 60 years old within the meaning of section 1203.09, subdivision (f).[4]

---

[4] The jury found defendant not guilty on all counts related to Evelyn J., Ida G., Robyn L., and Jeanne A. It could not reach a verdict on counts related to Evangeline B.

11

The trial court found true allegations that defendant had suffered two prior strike convictions and two serious felony convictions. The court sentenced defendant to a total prison term of 210 years to life.

## DISCUSSION

### I.  Sufficient Evidence Supported the Convictions

On appeal, defendant contends there was insufficient evidence that he was the home intruder in each of the incidents for which he was convicted. We disagree.

The standard of review is well established. "In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054 (*Kraft*).)

" 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever

12

is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)

In assessing defendant's claim of insufficient evidence of identity, we first consider the Carol, Marjorie, and Marguerite incidents.

### 1. *Carol*

There was evidence that one shoe print recovered from Carol's residence matched the unique characteristics of defendant's shoe, and other shoe prints were consistent with defendant's shoes. This was strong evidence connecting defendant to the Carol break-in. In addition, the Carol incident shared numerous features with the other charged incidents. Carol was a elderly woman living in west Los Angeles. The invasion took place in the early morning hours. The intruder appeared to have entered the house through a window. The intruder held Carol down and put his hand over her mouth. He was wearing a dark ski mask, dark clothes, and dark gloves. He wore a dark, shiny athletic shoe. He sought jewelry and silverware. He methodically searched drawers and cupboards while having Carol accompany him to each room. At the end of the incident, he told Carol to sit for a short period of time. He disabled her telephone. As discussed below, these aspects of the crime were repeated in several of the other incidents for which defendant was convicted. The jury's guilty findings on the Carol counts were supported by substantial evidence.

### 2. *Marjorie*

In the Marjorie incident, the intruder stole a unique duffle bag, which was later found in defendant's possession. This was significant evidence connecting defendant to the Marjorie home invasion. The Marjorie incident also shared common characteristics with the other six home invasions for which defendant was convicted. The date, time, and location of the incident were consistent with the others, as was the profile of the victim. Marjorie described the intruder as tall, wearing a ski mask and dark clothes, with dark, shiny shoes. He sought silverware and jewelry. As in the Carol incident, the man led Marjorie from room to room while he meticulously searched drawers and cupboards. As in the Carol incident, the man told Marjorie to wait a short period after he left, and the

13

jury could infer he disabled her telephone. The jury could reasonably find defendant guilty in connection with the Marjorie incident.

### 3. *Marguerite*

There was evidence that a bracelet belonging to Marguerite was recovered in defendant's possession, thus connecting him to the burglary at her house. Marguerite identified defendant's shoes as the same shoes the intruder wore. The Marguerite incident further shared common characteristics with the other incidents, including the date, time, location, and profile of the victim. As in the other incidents, the man wore a black ski mask, dark gloves, and dark clothes. As in the Carol incident, the intruder began by touching Marguerite's face, and instructing her not to talk or scream. He led Marguerite from room to room while he meticulously searched drawers and cupboards, as in the Carol and Marjorie incidents. He told Marguerite to wait a short period after he left, as in the Carol and Marjorie incidents. Under all of the circumstances, the jury reasonably could conclude defendant was the intruder at Marguerite's home.

### 4. *Lois, Marion, Joanne, and Ernestine*

No evidence directly connected defendant to the Lois, Marion, Joanne, and Ernestine incidents, such as a definitive shoe print or stolen items in defendant's possession. However, there was evidence that in each of these four cases, police recovered shoe prints that were consistent with defendant's shoes. All four also shared numerous characteristics with the Carol, Marjorie, and Marguerite incidents. These included the date, time, general location, and profile of the victim. In all of the incidents, the manner of entry appeared to be a window. In all but the Joanne incident, there was evidence the intruder wore a dark mask. In all but the Joanne and Ernestine incidents, there was evidence the intruder wore dark clothes. In the Marion incident, as in the Carol, Marjorie, and Marguerite incidents, the intruder led Marion from room to room as he searched every drawer and cupboard. As in the Carol and Marjorie incidents, the intruder at Marion's house was looking for silver dishes and jewelry, in addition to cash. Joanne was not home when the break in occurred, but she found jewelry and silver dishes missing, as did Lois. In the Carol, Marjorie, Marguerite, and Marion incidents, the

14

intruder told the victim to wait a short period after he left. In the Carol, Marjorie, Lois, Ernestine, and Marion incidents, the intruder in some way manipulated or disabled the telephone.

Our task is only to determine whether *any* rational trier of fact could have found beyond a reasonable doubt that defendant was the intruder in each charged incident. (*Zamudio, supra,* 43 Cal.4th at p. 357.) Under this standard of review, we must conclude there was substantial evidence to support the jury's verdicts as to each incident. Defendant contends the incidents were not similar enough to each other, or distinctive enough, to allow the jury to conclude the same person committed all of the offenses, and that he was the offender. Again, we disagree. Although there were differences in the evidence on each home invasion, there were distinctive features shared among several of them. The jury reasonably could conclude the evidence identified defendant as the intruder in at least some of the burglaries, and that all of the incidents shared enough distinctive characteristics to identify defendant as the perpetrator in each. (*Kraft, supra,* 23 Cal.4th at p. 1062.) It is not our role to reweigh the evidence.

Neither *People v. Martinez* (1992) 10 Cal.App.4th 1001 (*Martinez*), nor *People v. Jackson* (1967) 254 Cal.App.2d 655 (*Jackson*), require a different result. In *Martinez*, the defendant was charged with various crimes associated with his driving a stolen car. (*Martinez*, at p. 1002.) At trial, the court allowed expert evidence regarding how auto theft rings operate, although there was no evidence the defendant was part of such a ring. (*Id.* at pp. 1004-1005.) The Court of Appeal found the trial court erred in admitting evidence of other crimes without first requiring proof that the defendant was connected with such other crimes. (*Id.* at p. 1008.) The thrust of the evidence was to impermissibly suggest the defendant fit a certain criminal profile. (*Id.* at p. 1006.)

No such evidence was offered or admitted in this case.[5]  The prosecution did not advance a theory based on inferences to be drawn from crimes committed by other people.  Instead, all of the evidence related to charged crimes, and was offered to prove the charged crimes.  The People did not compare defendant's alleged conduct to a generic criminal profile, but instead attempted to create a single "profile" applicable only in this case.  Unlike the auto theft ring evidence in *Martinez*, there is nothing inherently prejudicial in a prosecutorial strategy of proving the People's case by offering evidence connecting the defendant to the charged crimes, and by proving similarities between a number of charged crimes to argue they were committed by one person.  *Martinez* is inapposite.

In *Jackson*, the People offered evidence of prior, uncharged crimes, committed by the defendant's accomplice, without establishing the defendant was involved in the uncharged prior crimes.  (*Jackson, supra,* 254 Cal.App.2d at p. 657.)  The Court of Appeal noted that evidence of crimes "linked to no one at all is clearly inadmissible to prove any element of the crime charged against a defendant, even though the crime occurred within reasonable proximity of time and place."  (*Id.* at p. 658.)  The court thus concluded it was error for the trial court to admit evidence of crimes committed by a third person when the defendant was tried alone.  (*Id.* at pp. 659-660.)  *Jackson* describes a situation not presented in the case at bar.  Although defendant contended the charged crimes were "connected to no one," that was the issue to be decided in this case.  The prosecution did not offer evidence of other crimes concededly committed by a third person, to suggest defendant was therefore guilty of the crimes charged in this case.  Instead, all of the prosecution evidence was intended to prove defendant committed each of the crimes charged.  It was for the jury to determine whether this evidence was credible, whether the alleged similarities between the charged crimes indicated a single

---

[5]  We also note the issues on appeal do not include a challenge to any trial court ruling on the admissibility of modus operandi or "profile" evidence.  Defendant only contends there was no substantial evidence to support the jury verdicts.

16

perpetrator, and whether the asserted connections between the crimes and defendant were sufficient to identify him as that perpetrator.

Thus, *Kraft*, *supra*, 23 Cal.4th 978, is on point. In *Kraft*, the defendant was convicted of murdering 16 men between 1972 and 1983. (*Id.* at p. 1002.) In several of the murders, there was no evidence directly connecting the defendant to the crime. (*Id.* at pp. 1003-1021.) On appeal, our high court rejected the argument that the trial court erred in denying a motion to sever the homicide counts and try them separately. The high court noted the evidence of all of the murders was cross-admissible, and the charged offenses were sufficiently similar to support an inference that the defendant acted according to a plan. (*Id.* at p. 1031.) The court further rejected the defendant's argument that there was insufficient evidence to support eight of the convictions because, apart from "speculative inferences," "modus operandi was the only evidence or theory of his guilt." (*Id.* at p. 1053.) The court concluded that based on similarities between several of the murders, including one in which strong evidence linked defendant to the victim, the jury could reasonably find the defendant guilty of the eight challenged homicides. (*Id.* at pp. 1054-1057.) This included that the victims fit a common profile; their bodies were disposed of in similar ways; several of the bodies had similar ligature markings or burns, and the presence of certain intoxicants in the victim's systems. (*Ibid.*) Variations among the offenses did not invalidate the jury's conclusions.

Finally, the court rejected the defendant's argument that the trial court erred in instructing the jury in connection with modus operandi. The court disagreed with the defendant's assertion that "modus operandi requires one single set of distinctive marks common to all charged counts . . . ." (*Kraft, supra,* 23 Cal.4th at p. 1061.) Instead, the court noted "even though various victims in this case were killed under different circumstances, certain unique circumstances nevertheless were common to two or more murders. We conclude that, given the commonality of certain features of the various offenses present in the record of this case, the task of determining the degree of distinctiveness and the number of such circumstances necessary to establish defendant's

17

identity as the perpetrator of these offenses was a matter for the jury." (*Id.* at pp. 1061-1062, see also *People v. Vines* (2011) 51 Cal.4th 830, 856-858.)

The reasoning in *Kraft* is equally applicable here. There were common features among the home invasions for which the jury convicted defendant, as well as other evidence creating a reasonable inference that defendant was connected to the crimes. We do not make credibility determinations or reweigh the evidence on appeal. Based on the evidence, the jury reasonably could conclude defendant was the intruder in the seven incidents for which he was convicted.

## II. The Trial Court Did Not Abuse its Discretion in Admitting Lois's Son's Statements Under Evidence Code Section 1240

Defendant argues the trial court erred in allowing Lois's son to testify as to the statements she made to him immediately following the incident at her home. The trial court concluded the statements were admissible as spontaneous utterances within the meaning of Evidence Code section 1240.[6] At a section 402 hearing, Lois's son testified that when he arrived at Lois's home shortly before 7:30 on the morning of the incident, Lois was standing at the door, whimpering and crying. Lois told her son she had been robbed. She had not called the police because the intruder disconnected her telephones. Upon realizing her telephone was inoperative, Lois simply waited for her son to arrive. Lois's son testified that Lois had been crying "since two in the morning and then on from 4:30, when she thought the coast was clear . . . ." It took her 20 to 30 minutes to recount the details of the incident because she was so upset. Lois had urinated in her clothes during the robbery. Her son saw that her pants were wet.

---

[6] Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

18

The trial court concluded that although there was a gap of at least three hours between the departure of the intruder and when Lois told her son about the incident, Lois's statements could be admitted as excited utterances. The court explained, in part: "But the fact that [her son] was the first person she saw after the incident, that she didn't leave the house, she didn't leave her bedroom, that she was lying there – the testimony is that the son had never seen her that upset. It took him quite a while to get the story from her. He testified 20 to 30 minutes, but the call came in as longer than that, not anywhere near 7:20. [¶] But it does appear to me that these statements were made under circumstances where the person would not be in an emotional position to have been fabricating it, but was under the stress, very much under the stress of the initial incident which had occurred that morning."

We find no abuse of discretion. (*People v. Stanphill* (2009) 170 Cal.App.4th 61, 73.) "[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief. [¶] The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is thus not the nature of the statement but the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant." (*People v. Farmer* (1989) 47 Cal.3d 888, 903-904, overruled on another point in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

In this case, there was substantial evidence that even though hours passed between the time defendant left Lois's house and her son's arrival, Lois remained in a state of intense excitement, and she spoke to no one during that period. There was evidence she had difficulty speaking when her son arrived. She was crying, and had not even changed her soiled pants. Even though in theory Lois had time to calm down and reflect before recounting the incident to her son, there was substantial evidence that she had not, in fact, calmed down significantly during that time.

19

*People v. Ramirez* (2006) 143 Cal.App.4th 1512 (*Ramirez*), does not support defendant's argument. In *Ramirez*, after the victim was assaulted she rode in a car with her alleged assailant, showered, said nothing about the rape at the first opportunity to do so to third parties, returned to a car with the alleged assailant, fell asleep in the car, woke up in a strange apartment, told a third person about the rape, walked to a hotel at least four hours after the assault, and reported the rape to a different person. (*Id.* at pp. 1524, 1525.) The appellate court concluded the trial court erred in admitting the victim's out-of-court statements as spontaneous utterances. The court explained that the "narrative style as well as the quantity, detail and content" of the victim's statements suggested they were made after she had engaged in a deliberative or reflective process. (*Id.* at p. 1525.)

In contrast, here there was substantial evidence that Lois did nothing following the robbery except remain in her home, crying, and that she remained extremely distraught while she waited for her son. " ' "[N]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and *while the reflective powers were still in abeyance*." [Citation.]' [Citation.]" (*Ramirez, supra,* 143 Cal.App.4th at p. 1524.)

Substantial evidence supported the trial court's factual determination that Lois was "under the domination of nervous excitement caused by the event, so that her utterances were spontaneous and unreflecting." (*People v. Blacksher* (2011) 52 Cal.4th 769, 810.) The court did not abuse its discretion in admitting Lois's out-of-court statements. (*Ramirez, supra,* 143 Cal.App.4th at p. 1523.)

## DISPOSITION

The trial court judgment is affirmed.


BIGELOW, P. J.

We concur:


RUBIN, J.            FLIER, J.

20