Filed 9/8/15  P. v. Reghitto CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040747 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1232007) |
| v. | |
| JOSEPH REGHITTO, | |
| Defendant and Appellant. | |

Defendant Joseph Reghitto pleaded no contest to one felony count of sexual penetration of a person under 18 with a foreign object (Pen. Code, § 289, subd. (h), count 1),[1] and one misdemeanor count of annoying or molesting a child (§ 647.6, subd. (a)(1), count 2).  At sentencing, the trial court denied probation and imposed the low term of 16 months on count 1, along with a concurrent sentence of 30 days on count 2.  In addition to the section 290 registration required for count 2, the court exercised its discretion and ordered Reghitto to register under section 290 for count 1 as well.

On appeal, Reghitto argues the trial court abused its discretion in denying probation and instead sentencing him to 16 months in state prison.

We agree the trial court improperly determined Reghitto was presumptively ineligible for probation under section 1203.067.  However, Reghitto cannot show he was prejudiced by the trial court's error because the trial court also independently evaluated

---

[1] Unspecified statutory references are to the Penal Code.

his suitability for probation under California Rules of Court, rule 4.414.[2] Accordingly, we will affirm the sentencing order.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.  *Facts relating to the offenses and investigation*

In May 2012, Brian Thompson, vice principal of instruction at Leland High School (Leland) in San Jose, California, contacted the San Jose Police Department to report he had received an anonymous letter claiming Reghitto, vice principal of activities at Leland, was having a sexual relationship with the victim, a Leland student.

Thompson advised police the letter said Reghitto met the then-16-year-old victim after midnight at a local park following back-to-school night on September 2, 2011. During the encounter, Reghitto put his finger in the victim's vagina. The letter also advised that phone records and text messages from the victim's cell phone and Reghitto's cell phone would confirm an ongoing sexual relationship and sexual communications between the two.

San Jose police officers interviewed the victim at Leland, and she informed the officers she began communicating with Reghitto during the summer of 2011. She saw Reghitto at the school gym where she was working out, and he began flirting with her on Facebook. After he gave her his cell phone number, they communicated mostly by text messages, which became increasingly flirtatious and sexual in nature. On September 1, 2011, the victim and Reghitto exchanged text messages about meeting at a local park at 1:00 a.m. after Reghitto was through drinking with some colleagues at a bar after back-

---

[2] Unspecified rule references are to the California Rules of Court.

[3] We derive the facts from the probation report, transcript of the preliminary hearing and other documents contained in the record.

to-school night. The victim said she drank alcohol with a friend before she went to meet Reghitto at the park.[4]

She met Reghitto at the park, where they started talking. Reghitto pulled her toward him and they began to kiss. He put his hands inside her pants and inserted a finger into her vagina. She felt uncomfortable and asked him to stop. Reghitto said he wanted to continue and bring her to orgasm. The victim again said she wanted him to stop and he did. They hugged a little longer, and the victim went home.

In the days following, the victim and Reghitto exchanged text messages, all of which were sexual in nature. In one of those messages, Reghitto implied that he wanted to have intercourse with the victim. The victim's friend forwarded a photo of the victim to Reghitto in which the victim was topless but with her arm across her chest. Reghitto at some point learned that the victim was not yet 18 years old, and she said his text messages became less sexual thereafter.

When interviewed by police, Reghitto initially denied communicating with the victim on Facebook. He subsequently admitted texting her somewhere between 50 and 100 times, though he denied meeting her in the park. Later, Reghitto admitted that he met her at the park, but said all they did was kiss. He expressly denied putting his hand in her pants. Police asked if there might be text messages indicating that he put his finger in the victim's vagina, Reghitto said it was "possible," and he was sorry. He finally admitted putting his finger in her vagina, but he stopped "due to his conscience, which started too late." Reghitto told police he was relieved to admit what had happened, although he knew the consequences would be "bad." Reghitto also ultimately admitted that he and the victim exchanged multiple sexually explicit text messages.[5]

_____

[4] At the preliminary hearing, on cross-examination, the victim recanted and said she did not drink alcohol before meeting Reghitto that night.

[5] Following his arrest, police determined Reghitto and the victim exchanged more than 1300 text messages over a four-week period.

During their investigation, police spoke to a former female student at Leland who had graduated in 2011. This former student admitted having a "very close relationship" with Reghitto during her senior year, which involved hugging and kissing. Although they never had sex, they texted each other many times about "going farther [*sic*], either hooking up in his car," or going to Reghitto's house when his wife was gone. After her father found an explicit letter written by Reghitto, he confronted him at a football game. However, her father did not want Reghitto prosecuted because he did not want the matter to affect her life or grades.

A clerk who worked at Leland told police she saw Reghitto hug the former student, "in what she perceived as an intimate embrace." She confronted Reghitto, but he dismissed it. In her opinion, Reghitto was "carefree and flirtatious."

### B.    *Trial court proceedings*

Reghitto was charged in a first amended information with a felony count of sexual penetration of a person under 18 years of age (§ 289, subd. (h)) and a misdemeanor count of annoying or molesting a child (§ 647.6, subd. (a)(1)).[6] Prior to summoning the jury panel, Reghitto entered a plea of no contest to both counts. During the change of plea hearing, the trial court advised Reghitto he was eligible for a grant of probation and that its decision on probation would be based on the probation recommendation and the referral report. The court also noted it had told Reghitto's counsel "there is a very good possibility, although it is by no means guaranteed," that it would grant probation.

### C.    *Probation officer's report*

In the report prepared for the originally-scheduled December 2, 2013 sentencing hearing, the probation officer advised that the victim's father reported Reghitto's conduct had "devastat[ed]" his daughter and "fractured" the family. The victim withdrew from

---

[6] The original information included an additional charge of felony distribution or exhibition of harmful matter to a minor (§ 288.2, subd. (a)).

4

school for the last three weeks of her senior year because of the comments and "ridicule" she received from other students. Though she completed her degree requirements and attended graduation, she moved out of her parents' house shortly thereafter.

Her parents have "spent a lot of effort repairing their relationship" with the victim. Everyone in the family, including siblings, had gone to counseling, and the victim continued to see a therapist at least twice a month. The victim "put a lot of undue blame on herself."

The victim's father had been a coach at Leland for a number of years, but resigned from a job he "loved" because of what Reghitto did. He wanted the court to know that Reghitto left a "wake of bodies" behind him.

In his written and oral statements to the probation officer, Reghitto "admitted exchanging inappropriate text messages with the victim that were sexual in nature [that] led to" him meeting her in the park where he kissed her and digitally penetrated her. Afterward, he exchanged more sexually-related text messages with the victim until approximately three months before his arrest.

In 2010 and 2011, Reghitto had suffered several family tragedies and was unhappy being an administrator rather than a teacher. Reghitto blamed alcohol consumption for his actions the night he met the victim in the park and believes it affected his judgment. He denied having any problems in his marriage prior to the offense.

Reghitto denied being a threat toward young girls or the community and said he had "addressed his conduct in counseling, and continues to attend therapy regularly." For six months, he "attended weekly Alcoholics Anonymous meetings," but stopped "when he felt they were no longer needed." He stopped drinking entirely.

His teaching and administrative credentials were revoked following his arrest and his wife, another school administrator, was now the family's sole source of financial support. He barely left his house for the first year, but now volunteers at his church. He expressed "intense remorse for the victim." Reghitto hoped the court would impose a

county jail sentence that he could serve on house arrest. If sent to state prison, he was concerned his absence would have a negative impact on his four-year-old daughter.

The probation officer assessed Reghitto using the Corrections Assessment Intervention System (CAIS), which is used to gauge a defendant's needs and risk to the community. Pursuant to this assessment, the probation officer determined that Reghitto would benefit from continued counseling and alcohol abuse services in order to remain "successful and law-abiding in the community." The probation officer also used the Static-99R assessment to determine Reghitto's risk of recidivism. She scored him as a "2," which indicated a low to moderate risk of reoffending.

The probation officer believed Reghitto's eligibility for probation was limited under section 1203.067. However, it was her opinion this limitation could be overcome since Reghitto had no prior convictions for similar crimes and the "facts and circumstances" of his sexual penetration offense "could be viewed as less severe compared to other sex offenses that fall under the same limitation listed in Section 1203.067."

The probation officer then applied the relevant criteria in rule 4.414 (criteria affecting probation). The officer enumerated the sentencing factors she believed would support imposition of a state prison term and recounted the aggravating and mitigating factors she considered applicable to the court's possible selection of one of the three prescribed terms of imprisonment. Specifically, the probation officer noted the aggravating circumstances included that Reghitto's "actions appeared planned and occurred over a period of time, and [he] took advantage of a position of trust to commit the offense." The only mitigating circumstance identified by the probation officer was Reghitto's lack of a criminal history.

The probation officer expressly noted she had "struggled [in] formulating [her] ultimate recommendation." She recommended Reghitto be given "a maximum county jail sentence, with no early release programs, and impose a three year [f]ormal

6

[p]robation grant." The officer further recommended the court impose substance abuse and sex offender probation conditions.

Attached to the probation officer's report were, among other documents, copies of an assessment prepared by a defense psychologist, Rahn Minagawa, Ph.D., a letter from Lynne Woodward, Reghitto's therapist, multiple reference letters from family, friends, and former colleagues, as well as a letter from a senior member of Reghitto's church. All of these documents urged the trial judge to impose probation or otherwise impose a lenient sentence.

Dr. Minagawa's assessment described Reghitto's self-reported alcohol problems, including that he had experienced over 10 alcohol-related blackouts. Reghitto told Dr. Minagawa that before he met the victim in the park, he consumed over six alcoholic drinks in less than two hours. He admitted he initiated contact with the victim on Facebook after seeing her working out at the school gym, but said she had "texted him back in sexually explicit ways." According to Dr. Minagawa, Reghitto had been "in therapy since his arrest," was "gaining insight into his behavior and motivations, and ha[d] made substantial progress in identifying triggers." Dr. Minagawa administered the MMPI-2 (Minnesota Multiphasic Personality Inventory), which suggested Reghitto did not have a personality disorder, and also assessed him using the Static-99R. Dr. Minagawa reported Reghitto scored a "1" on the Static-99R.

At a December 2, 2013 hearing for receipt of the probation report, the trial court noted the discrepancy between the Static-99R scores reported by the probation officer and by Dr. Minagawa. The court accepted the probation officer's Static-99R score of "2," which reflected a low to moderate risk of reoffending, and rejected Dr. Minagawa's score of "1," which reflected a low risk for reoffending. The court advised defense counsel that Dr. Minagawa might want to "review that and perhaps reconsider his conclusions and recommendations."

7

The court also read into the record the probation officer's supplemental memorandum, dated December 2, 2013, which reported a conversation she had with Thompson on November 26, 2013:

"During the course of [Thompson's] investigation, the student who disclosed the instant offense to school officials was to be removed and transferred to another school for making 'false statements' about the defendant. This action was driven by the defendant. Thompson [cannot] believe the defendant went to this 'level' to cover his actions. If Thompson had not ultimately learned the truth from the victim, that student would have definitely been removed.

"Thompson changed school districts after the instant offense. He remains concerned over retaliation for his children and his ex-wife because the defendant's wife is the principal where his children go to school, which is also where his ex-wife works.

"Thompson further emphasized the impact defendant's actions had on his former school and the community . . . ."

The court informed counsel: "I raise this because I imagine counsel will want to address the content of this supplemental report . . . at our formal sentencing hearing. [¶] Obviously it raises some great concerns to the Court, but I think it should be subject to greater adversarial testing."

On December 31, 2013, Reghitto filed a letter from Dr. Minagawa which explained why he gave Reghitto a different score on the Static-99R than the probation officer. Dr. Minagawa conceded it was "technically" correct for the probation officer to score a question about noncontact sexual offences with a "l," but he still believed his score of "0" on that question was more accurate because Reghitto's "clinical presentation" showed a lack of any "paraphilic interests or diagnosis."

The prosecutor filed a sentencing memorandum which urged the court to deny probation and sentence Reghitto to 16 months in prison. In his sentencing memorandum, Reghitto argued Thompson's statements in the supplemental probation officer's report

8

were inaccurate and unreliable, and asked the court to impose a county jail term of eight to 12 months, to be served on electronic monitoring.

> D.    *Sentencing hearing*

Thompson testified he first interviewed the victim on April 19, 2012, and she denied having a sexual relationship with Reghitto.  Thompson then telephoned the victim's father, who said a former student and player on his team had overheard two of the victim's former friends talking about the victim having a sexual relationship with Reghitto.  The victim's father thought one of the victim's former friends was lying in order to "get[] back at [the victim] for what [the victim] had done to [her]."  He also had confronted the victim, but she denied having any relationship with Reghitto.

Thompson talked to Reghitto, who told him the victim's former friend made up the report of a sexual relationship to get back at Reghitto and the victim.  The victim had told Reghitto that her former friend had some sort of contraband in her car, so Reghitto went and searched it.  He said the victim's former friend threatened to "blackmail him, . . . [and] make something up against him if he got her in trouble."  According to Thompson, Reghitto said he was contemplating whether he should "file charges" against the victim's former friend for making a false report.

Thompson said that Reghitto was aware expulsion proceedings had been initiated against the victim's former friend because of her reporting the sexual contact between victim and Reghitto, but he never objected or tried to halt them.  The victim's former friend eventually showed the principal a text message from Reghitto to the victim which referenced a sexual act, and Thompson reinterviewed the victim.  At this point, "the truth came out."

The victim's father testified he had been friends with and worked with Reghitto for the past two years.  Several days before Reghitto was arrested, the victim's father saw Reghitto at a school fundraising event.  He told Reghitto he did not believe the rumors and he "had his back."  On May 1, 2012, Reghitto texted the victim's father telling him,

"We got a statement from a student that said [the victim's former friend] was trying to screw me over. [The principal] contacted the district about moving her. I'm assuming the meeting with [the victim's former friend] will come tomorrow."

The victim's sister attended school the day after Reghitto's arrest, but came home "in a puddle of tears." Neither she nor the victim returned to school for the final three weeks. The victim and her sister did attend their graduation, and the victim's father heard some people shout "Joe" and "Reghitto" as she received her diploma. After graduation, the victim cried "for hours."

The victim's father explained how Reghitto's offense had impacted other people: "My wife works in the school district. She has [had] to deal with the murmurs in the hallways . . . for the last year and a half. . . . [A] travesty is [that] Mr. Thompson and [the principal were] two of the best administrators I have ever worked for in 17 years of coaching by far. . . . [O]ne had to retire a year earlier than she wanted to and one had to leave his post where he should [have been] named the principal."

Woodward, a licensed clinical social worker, testified on Reghitto's behalf and said they had had 54 counseling sessions to date. Before that, Reghitto had voluntarily seen another therapist, Adrian Medina, several times between February and May 2012 for "sexual acting out." Reghitto did not disclose his conduct with the victim to Medina.

Woodward believed Reghitto had made significant progress in their counseling sessions. She diagnosed him with attention deficit hyperactivity disorder (ADHD), anxiety, and as having alcohol "issues." Reghitto told Woodward he was remorseful for what happened with the victim and Woodward believed Reghitto was "capable of performing positively" on probation.

Reghitto's wife testified Reghitto did all of the cooking, laundry, and housekeeping. If he were incarcerated, it would have a "major impact" on their family, and she would have a difficult time managing the household since they could not afford daycare. Reghitto had become involved with her church after she confronted him in

10

February 2012 about his having an affair with a student's mother.[7]  When asked about the effect of expulsion on the victim's former friend, she agreed that if the girl had been expelled, it would have greatly impacted her ability to get into college.

A senior member of Reghitto's church, Chester Hutchinson, testified Reghitto was helping him with various programs, including Sunday school.  Hutchinson believed Reghitto was "very honest and very sincere about his spiritual life," and remorseful about his prior conduct with both the victim and the former student.

Following argument by counsel, the trial court took a recess and retired to chambers to "consider fully the arguments that you have made and the evidence that's been presented."  Upon returning to the bench, the trial court acknowledged its role of "consider[ing] which of [the general objectives of sentencing] are of primary importance in this particular case, guided by both the statutory statements of policy and the criteria set forth in the Rules of Court, as well as of course the particular facts and circumstances of this case."

The trial court then expressed its belief that "[Righetto's] felony conviction renders him presumptively ineligible for a grant of probation under the provisions of [section] 1203.067,"[8] meaning he "is not eligible for probation unless this Court finds that this is an unusual case and that the interests of justice would best be served by

---

[7] Reghitto's wife also testified that, sometime after February 2012 but before his arrest, Reghitto confessed to a second affair with a teacher at summer school.

[8] Section 1203.067 provides, in pertinent part:  "(a) Notwithstanding any other law, before probation may be granted to any person convicted of a felony specified in Section . . . 289, who is eligible for probation, the court shall do all of the following:  (1) Order the defendant evaluated pursuant to Section 1203.03, or similar evaluation by the county probation department.  (2) Conduct a hearing at the time of sentencing to determine if probation of the defendant would pose a threat to the victim.  The victim shall be notified of the hearing by the prosecuting attorney and given an opportunity to address the court."

granting probation." Both counsel expressly agreed that section 1203.067 imposed a presumption against probation eligibility.

The court later stated, "I find first that the defendant has not overcome the presumption against probation ineligibility . . . ." The court addressed what it believed were the four applicable criteria listed in rule 4.413(c) and expressly found those criteria were unfavorable to a grant of probation.[9] Despite this finding, the court "felt that it was necessary in this very difficult case to go further and to examine *all* of the criteria that would affect a grant of probation *in any case*, not just in a case where there is a presumption against the grant of that probation." (Italics added.) Accordingly, the trial court proceeded to evaluate Reghitto's eligibility for probation under the factors set forth in rule 4.414.[10]

---

[9] Rule 4.413 provides, as relevant: "(b) Probation in unusual cases. If the defendant comes under a statutory provision prohibiting probation 'except in unusual cases where the interests of justice would best be served,' or *a substantially equivalent provision*, the court should apply the criteria in (c) to evaluate whether the statutory limitation on probation is overcome; and if it is, the court should then apply the criteria in rule 4.414 to decide whether to grant probation. [¶] (c) Facts showing unusual case. The following facts may indicate the existence of an unusual case in which probation may be granted if otherwise appropriate: [¶] (1) . . . A fact or circumstance indicating that the basis for the statutory limitation on probation, although technically present, is not fully applicable to the case, including: [¶] (A) The fact or circumstance giving rise to the limitation on probation is, in this case, substantially less serious than the circumstances typically present in other cases involving the same probation limitation, and the defendant has no recent record of committing similar crimes or crimes of violence . . . . [¶] . . . [¶] (2) . . . A fact or circumstance not amounting to a defense, but reducing the defendant's culpability for the offense, including: [¶] . . . [¶] (B) The crime was committed because of a mental condition not amounting to a defense, and there is a high likelihood that the defendant would respond favorably to mental health care and treatment that would be required as a condition of probation; and [¶] (C) The defendant is youthful or aged, and has no significant record of prior criminal offenses." (Italics added.)

[10] Rule 4.414 provides: "Criteria affecting the decision to grant or deny probation include facts relating to the crime and facts relating to the defendant. [¶] (a) . . . Facts relating to the crime include: [¶] (1) The nature, seriousness, and circumstances of the (continued)

*1.      Evaluation of the facts of the crime (rule 4.414(a))*

The trial court discussed the various criteria set forth in rule 4.414(a) relating to the facts of the crime and indicated which of the factors were unfavorable to Reghitto and which were favorable.[11]

The first unfavorable factor the trial court found was the "nature, seriousness and circumstances of the crime as compared to other instances of the same crime." (Rule 4.414(a)(1).) The trial court agreed with the probation report that this factor was unfavorable because Reghitto had "time to reflect before committing the offense and in

_____

crime as compared to other instances of the same crime; [¶] (2) Whether the defendant was armed with or used a weapon; [¶] (3) The vulnerability of the victim; [¶] (4) Whether the defendant inflicted physical or emotional injury; [¶] (5) The degree of monetary loss to the victim; [¶] (6) Whether the defendant was an active or a passive participant; [¶] (7) Whether the crime was committed because of an unusual circumstance, such as great provocation, which is unlikely to recur; [¶] (8) Whether the manner in which the crime was carried out demonstrated criminal sophistication or professionalism on the part of the defendant; and [¶] (9) Whether the defendant took advantage of a position of trust or confidence to commit the crime. [¶] (b) . . . Facts relating to the defendant include: [¶] (1) Prior record of criminal conduct, whether as an adult or a juvenile, including the recency and frequency of prior crimes; and whether the prior record indicates a pattern of regular or increasingly serious criminal conduct; [¶] (2) Prior performance on probation or parole and present probation or parole status; [¶] (3) Willingness to comply with the terms of probation; [¶] (4) Ability to comply with reasonable terms of probation as indicated by the defendant's age, education, health, mental faculties, history of alcohol or other substance abuse, family background and ties, employment and military service history, and other relevant factors; [¶] (5) The likely effect of imprisonment on the defendant and his or her dependents; [¶] (6) The adverse collateral consequences on the defendant's life resulting from the felony conviction; [¶] (7) Whether the defendant is remorseful; and [¶] (8) The likelihood that if not imprisoned the defendant will be a danger to others."

[11] The trial court found the following criteria were favorable to Reghitto: (1) no weapon was employed (rule 4.414(a)(2)); (2) degree of monetary loss to the victim (rule 4.414(a)(5)); and (3) the crimes did not demonstrate criminal sophistication or professionalism (rule 4.414(a)(8)).

effect engaged in what amounts to almost a grooming behavior . . . through the ongoing and continuous text communications of increasingly provocative nature."[12]

Turning to the "vulnerability" of the victim under rule 4.414(a)(3), the trial court disagreed with the probation officer's assessment that this factor was favorable to granting probation. The trial court noted the victim was a high school student and Reghitto, as an administrator at her school, was "someone with great authority over this student." Accordingly, the trial court also found that Reghitto "took advantage of a position of trust or confidence" as an unfavorable factor under rule 4.414(a)(9).

The trial court also specifically found that Reghitto inflicted physical or emotional injury on the victim (rule 4.414(a)(4)) and this factor militated against a grant of probation. Reghitto "actively pursued this child" and thus was an active participant in the offense under rule 4.414(a)(6).

As to whether the offenses were committed "because of an unusual circumstance such as great provocation which is unlikely to recur" (rule 4.414(a)(7)), the trial court again disagreed with the probation officer's evaluation that this was favorable. The trial court said this was unfavorable since "there is nothing . . . in the evidence . . . to suggest any such provocation or circumstance."

---

[12] Reghitto takes issue with the trial court's use of the term "grooming," citing evidence the victim was "sophisticated" as she may have consumed alcohol the night of the incident, sent him a provocative photo of herself after their meeting in the park and, in 2010, falsely confirmed rumors among Leland students that she had a sexual relationship with the wrestling coach. Whether the victim was more or less sophisticated than an average 16- or 17-year-old and whether she made questionable choices in her conduct with Reghitto is beside the point. The fact remains that Reghitto, an adult and administrator at the victim's school, initiated contact with her after seeing her working out at the school gym, and perpetuated that contact through increasingly sexual text messages, culminating in his agreeing to meet her in a park late in the evening where he hugged her, kissed her and put his finger in her vagina.

## 2. *Evaluation of the facts relating to Reghitto* (*rule 4.414*(*b*))

The trial court then discussed the criteria listed in rule 4.414(b), outlining which of these it found favorable or unfavorable to a grant of probation.

The trial court found several factors to be favorable to Reghitto, namely: (1) his lack of a prior criminal record (rule 4.414(b)(1)); (2) his prior performance on probation or parole (rule 4.414(b)(2)); (3) his ability to comply with the terms of probation (rule 4.414(b)(4)); (4) adverse collateral consequences on Reghitto's life resulting from the felony conviction (rule 4.414(b)(6)); and (5) the likelihood Reghitto would be a danger to others if not imprisoned (rule 4.414(b)(8)).

The trial court found the remaining factors to be unfavorable. Addressing Reghitto's willingness to comply with the terms of probation (rule 4.414(b)(3)), the trial court stated "[e]verything that has been presented to this Court, both in the nature of the offense itself, the circumstances of the defendant's behavior once caught, and even going to what he did or did not say to his mental health therapists, all appear . . . to reflect not a willingness or a recognition of the wrongfulness of his conduct, not a recognition of his need to change, but a recognition of what it's going to take to mitigate as much as possible the effect of what he has done."

The trial court also found the likely effect of imprisonment on the defendant or his or her dependents (rule 4.414(b)(5)) was unfavorable, stating Reghitto has an "incredible support network" within his church and in his family. As a result, though imprisonment "will be difficult, there is remediation on behalf of the family."

Finally, the court addressed the criteria whether Reghitto was remorseful (rule 4.414(b)(7)), again disagreeing with the probation officer's assessment in this regard. The trial court explained at length its conclusion that it did not believe Reghitto was remorseful: "It is my impression from all of the evidence that the defendant is remorseful only insofar as he is caught. He is remorseful for the first affair when he's caught. He's remorseful for the second affair when he's caught. He's remorseful for his conduct with

15

[the former student] when it comes out of those proceedings.  [*Sic*.]  He's remorseful for his conduct with [the victim] when he's caught.  [¶] I haven't heard a word about [the victim's former friend].  And the fact that the defendant was willing to allow a 16, 17, 18 year old girl, however old she was, to be removed from school three weeks before her high school graduation in order to protect himself casts, in this Court's view, incredible doubt on his protestations of remorse."

### 3. *Denial of probation and sentencing*

After addressing the relevant factors under rule 4.414, the court concluded, "[f]or all of the foregoing reasons, I find first that the defendant has not overcome the presumption against probation ineligibility, and that even if he had done so, the other factors and criteria affecting the grant of probation simply would not justify a grant of probation in this case."  Accordingly, the court denied probation and imposed the low term of 16 months on count 1, with a concurrent sentence of 30 days on count 2. Reghitto was awarded a total of four days of credits, consisting of two days of custody credit and two days of conduct credit.

Reghitto was ordered to register as a sex offender under section 290 on both counts.  He was further ordered to pay a $300 fee pursuant to section 290.3, plus $900 in penalty assessments; a $200 restitution fine; $40 court security fees on both counts; $30 courtroom facilities fees on both counts; a booking fee of $129.75; and restitution of $4,531 to the Victim Compensation and Government Claims Board.

Reghitto timely appealed.

## II.   DISCUSSION

### A.   *Standard of review*

The grant or denial of probation is within the trial court's discretion.  (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311, disapproved on another ground in *People v. Cook* (2015) 60 Cal.4th 922, 939.)  The reviewing court must determine whether the trial court's order " 'is arbitrary or capricious or exceeds the bounds of reason considering all

the facts and circumstances.' " (*Ibid*.)  Accordingly, " 'a denial of probation after consideration of the application of its merits is almost invariably upheld.' " (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1157.)

When determining whether a trial court abused its discretion by denying probation, we consider whether there is sufficient or substantial evidence to support the court's finding that a particular factor was applicable.  (*People v. Leung* (1992) 5 Cal.App.4th 482, 506-507.)  A reviewing court must set aside a sentence where "it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper." (*People v. Price* (1991) 1 Cal.4th 324, 492 (*Price*).)

The trial court, in deciding whether to grant or deny probation, must consider statutory guidelines, including the safety of the public, the nature of the offense, the interests of justice, the loss of the victim, and needs of the defendant.  (§ 1202.7.)  Rule 4.414 also sets forth certain criteria affecting a court's decision to grant or deny probation.  These criteria include facts relating to the crime, such as the "[t]he nature, seriousness, and circumstances of the crime as compared to other instances of the same crime." (Rule 4.414(a)(1).)  The criteria also include facts relating to the defendant, such as his prior record, his willingness to comply with the terms of probation, whether he is remorseful, and the likelihood that he will be a danger to others if not imprisoned.  (Rule 4.414(b).)  Additionally, in deciding whether to grant or deny probation, a trial court may consider additional criteria not listed in the rules, so long as those criteria are "reasonably related to the decision being made." (Rule 4.408(a).)  A trial court is generally required to state its reasons for imposing a prison sentence and denying probation.  (Rule 4.406(b)(2).)

In this case, the probation report advised the trial court Reghitto's "eligibility [for probation] is limited" under section 1203.067, but indicated this limitation could be overcome under rule 4.413 because Reghitto had no prior convictions for similar crimes

17

and the circumstances of the current offense were less severe when compared to other sex offenses. The report went on to discuss the criteria set forth in rule 4.414, noting "both favorable and unfavorable factors are present." Ultimately, the probation report recommended the trial court grant probation.

"The purpose of a probation report is to assist the sentencing court in determining an appropriate disposition. [Citation.] The court has the unquestioned discretion to reject it in part or in toto." (*People v. Municipal Court* (*Lopez*) (1981) 116 Cal.App.3d 456, 459.) Additionally, " '[a] trial court may minimize or even entirely disregard mitigating factors without stating its reasons.' " (*People v. Zamora* (1991) 230 Cal.App.3d 1627, 1637.) A "trial court need not articulate its reasons for rejecting factors which would support the grant of probation." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 366, disapproved of on another ground in *People v. Whitmer* (2014) 59 Cal.4th 733, 742.)

*B.    Analysis*

Reghitto contends the trial court abused its discretion in denying probation and sentencing him to prison instead. He complains the trial court erroneously "believed that its ability to grant probation was curtailed by . . . section 1203.067, subdivision (a)," and thus the denial of probation was arbitrary and capricious.[13] We agree the trial court improperly interpreted section 1203.067 as creating a presumption that Reghitto was ineligible for probation, but find he was ultimately not prejudiced by this error.

*1.    No presumption of probation ineligibility under section 1203.067*

There are a number of statutes which provide that probation may only be granted "in unusual cases where the interests of justice would best be served." (See, e.g., §§ 1203.045 [crime of theft in excess of $100,000]; 1203.046 [solicitation of minor to

---

[13] The People argue Reghitto has forfeited this argument because both parties agreed at sentencing that section 1203.067 applied to this case. (*People v. Scott* (1994) 9 Cal.4th 331, 356.) We assume without deciding that Reghitto may raise the claim on appeal and reach the merits.

commit certain felonies]; 1203.074 [crime of furnishing location for storage, manufacture or sale of controlled substances].)  Section 1203.067, on the other hand, makes no mention of "unusual case[s]" or the "interests of justice."  Rather, it sets forth certain preconditions that must be met before the trial court may grant probation to a defendant who has violated section 289, such as ordering the defendant to be evaluated under section 1203.03, conducting a hearing to determine if the defendant would pose a threat to the victim if probation were granted, etc.

The People argue that rule 4.413 must be applied not only where there is a statutory presumption against the grant of probation except in unusual cases, but also where there is "a substantially equivalent provision."  (Rule 4.413(b).)  In the People's view, section 1203.067 is a substantially equivalent statute.  We disagree.

Section 1203.067, subdivision (a) states "before probation may be granted to any person convicted of a felony specified in Section . . . 289, *who is eligible for probation . . . .*"  (Italics added.)  The requirements set forth in section 1203.067, such as the referral for an evaluation under section 1203.03, etc., only come into play *after* a defendant is initially found eligible for probation under criteria of rule 4.414.  (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1532.)  Section 1203.067 does not contain language indicating that defendants subject to its terms face any preliminary hurdles that must be overcome before they may be found eligible for probation.  All it describes are the steps the trial court must take before granting probation to an otherwise-eligible defendant who has suffered a qualifying conviction.

Accordingly, the trial court erred when it found that Reghitto's conviction under section 289 rendered him presumptively ineligible for probation under section 1203.067.

   2.  *Reghitto cannot show prejudice from the error*

Since the error in question is one of state law, we will affirm unless the appellant can show there is a reasonable probability a more favorable result would have been reached in the absence of the error.  (*People v. Watson* (1956) 46 Cal.2d 818, 836;

19

*Cassim v. Allstate Ins. Co*. (2004) 33 Cal.4th 780, 800.) A reasonable probability is one sufficient to undermine confidence in the outcome of the proceedings. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *In re Neely* (1993) 6 Cal.4th 901, 909.)

No such showing has been made. Despite its erroneous interpretation of section 1203.067, which led the trial court to needlessly analyze the factors set forth in rule 4.413, Reghitto was not prejudiced by this error. The trial court, after wrongfully concluding that Reghitto had "not overcome the presumption against probation ineligibility," went on to state that "*even if he had done so*," its evaluation of the factors set forth in rule 4.414 did not "justify a grant of probation in this case." (Italics added.) This is the same analysis the trial court would have undertaken in the absence of section 1203.067,[14] and as the court stated, its analysis of the rule 4.414 factors was independent of its (erroneous) interpretation and application of section 1203.067 and rule 4.413. The trial court evaluated Reghitto's eligibility under rule 4.414 and concluded probation was not justified. Reghitto makes no attempt to show the trial court would have granted probation absent its error, and we find there is no reasonable probability it would have done so.

> 3. *Substantial evidence supports the trial court's evaluation under rule 4.414*

In his brief, Reghitto challenges the trial court's analyses of the criteria in rule 4.414, arguing that many of the factors which it found to be unfavorable should be considered favorable. It is not this court's job to decide whether we agree with the trial court's conclusions. We are tasked with deciding whether substantial evidence supports

---

[14] In fact, as noted in *People v. Ramirez*, *supra*, 143 Cal.App.4th at page 1532, the trial court should have first reviewed the criteria under rule 4.414 to determine Righetto's eligibility. Having determined he was not eligible for probation under those criteria, it need not have considered section 1203.067 at all.

the trial court's findings that these various factors were unfavorable to a grant of probation in this case. Our review of the record shows it does.

In denying probation, the trial court made a lengthy record of all the reasons why it felt Reghitto was not a suitable candidate. Among those considerations were the serious nature of the crimes he had committed while holding a position of trust and authority over his victim, the facts which showed his active pursuit of a sexual relationship with the victim, and the court's belief that Reghitto's pattern of behavior whenever he is caught in an extramarital affair or an inappropriate relationship with a student cast serious doubt on his expressions of remorse.

Reghitto's argument that the trial court failed to properly consider his suitability for probation using the criteria in rule 4.414 belies the evidence to the contrary in the reporter's transcript. The court acknowledged its consideration of the probation officer's report, victim impact statements, letters of support provided by Reghitto's family and others, sentencing memoranda submitted by defense counsel and the testimony presented at the sentencing hearing both in favor of and in opposition to Reghitto's bid for probation.

Reghitto has failed to carry his burden to show the denial of probation was arbitrary, irrational, or otherwise erroneous.

## III.  DISPOSITION

The sentencing order is affirmed.

_____
                                      Walsh, J.[*]

WE CONCUR:

_____
        Rushing, P.J.

_____
        Elia, J.

---

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.